Loren HORTON, J.C. Chadwick, Donald
L. Ragland, J.D. Freeman and Ernest
Adams, Plaintiffs,

v.

Duford TAYLOR, Individually and in the
Official Office of County Judge of Se-
arcy County, Arkansas, Defendant.

Civ. No. 83–3053.

United States District Court,
W.D. Arkansas,
Harrison Division.

April 9, 1984.

Eddie Morgan, Stripling & Morgan, Clin-
ton, Ark., for plaintiffs.

Charles E. Clawson, Jr., Brazil & Clawson, Conway, Ark., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiffs are five residents of Searcy County, Arkansas, formerly employees of the Searcy County Judge in the County Road Department, employed primarily as road grader operators. They had been hired by Willis Dale Horton, a Republican, the County Judge at the time of their employment. In the general election of 1982, Horton was defeated by defendant, Duford Taylor, a Democrat. Taylor took office on January 1, 1983, and either prior to that time, or on the day that he took office, the plaintiffs were advised that their services would no longer be needed. They subsequently filed suit under the provisions of 42 U.S.C. § 1983, claiming that their termination was the result of their support of the defeated county judge.

The matter was tried to the court on February 10, 1984, and at the conclusion of the testimony, upon the request of the attorneys for the parties, the court allowed briefs to be filed. Briefs have been received, and the court is prepared to rule.

In this regard, the court feels compelled to state that the brief of defendant was not particularly helpful. This is clearly a case involving the doctrine set forth in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and other cases following that decision such as *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), cases which hold that non-policy making, non-confidential government employees may not be discharged or threatened with a discharge from a job that they are satisfactorily performing upon the sole ground of their political beliefs. In spite of this, defendant, in his nine-page brief, doesn't even cite either of these cases and appears not to recognize that the *Elrod* doctrine is the real issue in this case. Instead, defendant argues that plaintiffs did not have "an implied contract" of employment and thus did not have

a property right protected by the Constitution. Absent the possible problem caused by the county personnel policy, which will be discussed in more detail later, plaintiffs clearly do not have a property right in their employment since it was terminable "at will" under Arkansas law. *M.B.M. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980); *Miller v. Missouri Pacific Transportation Co.,* 225 Ark. 475, 283 S.W.2d 158 (1955). Plaintiffs' employment was not under tenure or contract, nor was there any clearly implied promise of continued employment unless the personnel policies accomplished this. Thus, at least absent the personnel policy, plaintiffs had no legitimate claim of entitlement to employment. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971). Without a "liberty interest" issue not urged here, unless the personnel policies to be discussed below prohibits it, plaintiffs could have been terminated for any reasons other than for exercising their constitutionally protected rights of political expression and association. Thus, the issues that this court must decide are whether such terminations were for reasons prohibited by *Elrod* and *Branti, supra,* and whether the county's personnel policies granted to the plaintiffs a property interest in their employment of which they could not be deprived without due process of law.

The court takes judicial notice of the fact that Searcy County is a predominantly rural county located in the mountainous regions of north Arkansas. According to the 1980 census, the county has a total population of less than 9,000, with its county seat, Marshall, and also its largest city, having a population of less than 1,600. The county is almost evenly split politically between Democrats and Republicans as evidenced by the frequent swing in the fortunes of its elected officials. The county

judge is the chief administrative officer of counties in Arkansas, and is elected to two-year terms. According to the testimony at the trial, the office of county judge of Searcy County changes almost every two years, with the Democrats and Republicans virtually switching places each successive term. For example, Willis Dale Horton, the Republican County Judge of Searcy County prior to the election of the defendant, Duford Taylor, had served a total of five terms (ten years), but rarely if ever during such period served two successive terms.

■ One of the primary responsibilities of county judges in rural counties such as Searcy County is to maintain many miles of rural roads, mostly unimproved and in almost all cases, unpaved. The author of this opinion, having been reared in a rural area not unlike Searcy County, can take judicial notice of the fact that whether a particular county judge is reelected may depend almost entirely upon how well the voting public believes he has done his job of maintaining these roads. Undoubtedly, to most of the voters of Searcy County, maintaining "their road" is the county judge's job, and his only job. If the public perceives that he has done it well, he is returned to office, and if not, his opponent is elected.

Because this is the case, the road crew which the county judge employs is, in effect, his "alter ego." The road crew which maintains the numerous miles of county roads are, in many cases, the judge's only contact with the voting public except, perhaps, in election years. Rural residents see the operator of the road grader, talk with him, have coffee or lunch with him, and, as far as many of them are concerned, he "is" the county and the county judge. If the roads aren't properly maintained or if a citizen's mail box is knocked down and run over, the grader operator is not the one blamed. It's the judge's fault.

The evidence in this case exemplifies what the court has set forth above. It would not serve a useful purpose for the court to discuss in detail the testimony of each of the plaintiffs in this case. Suffice it to say that most if not all of them were hired by defendant's predecessor, Willis Dale Horton, and are generally perceived by other residents of the county to be Republicans. At least two of the plaintiffs, Loren Horton and Ernest Adams, testified that they were Republican committeemen. There is dispute as to how active some of the plaintiffs were in Horton's campaign when he was defeated in November of 1982, but the evidence appears to be clear that most everyone in the county knew who were Republicans and who were Democrats. Willis Dale Horton very candidly testified that he thought he knew which of the county residents belonged to each party and who supported him and who did not. Former Judge Horton, when asked if it had not been the policy for many years for the new county judge of Searcy County to fire all employees of the former judge and start with a clean slate, answered "I think so—I know I always did." He testified that when he took office in each instance he "cleaned house" and retained and hired employees who he believed had supported him. In fact, the testimony at the trial indicated that many if not all of the plaintiffs had been employees of the county road department at various other times prior to the last term of Judge Horton. While the evidence in this regard was not developed as fully as it should have been, the court believes that it does not require much stretching of the evidence for the court to conclude that Searcy County virtually had two road crews, one for Republican years and another for Democrat years. When a Republican was in office, the Republican crew was allowed to work for the county, and when the Democrats served, the Democrats were employed. The court can find without question that most if not all of the plaintiffs owed their position with the county prior to January 1, 1983, to "the system" and that they understood the system very well. Again, the evidence is not totally clear in this respect, but it appears that it was the custom in Searcy County for the "Republican road crew" to expect to lose their jobs when a Democrat was elected

and, likewise, it was the custom for the "Democrat crew" to expect to be unemployed when a Republican was in office. When either of these political groups became unemployed because of a change of administrations, they appear to have largely bided their time, waiting until a change in the political winds allowed them to once again become employees of the county.

According to the testimony, the county road crew consisted of 17 full-time employees at the time Judge Taylor took office, and he terminated nine of these. Judge Taylor claims that he did not know what the political affiliation of those nine persons was, but it is undisputed that all of them worked for Judge Horton prior to his defeat in 1982, and that many of them had worked for prior Horton administrations.

It is also undisputed that the five plaintiffs were terminated by Judge Taylor on the day that he took office. During his testimony, he gave reasons for the terminations. Simply stated, his reasons were that these employees, according to what he knew about the maintenance of the roads in the past, had not been properly doing their job and had been misusing and abusing county equipment and property.

Plaintiffs argue, based on these facts, that *Elrod v. Burns, supra,* and *Branti v. Finkel, supra,* require that the court order that the plaintiffs be reinstated with back wages and attorney's fees. In reaching this conclusion, plaintiffs candidly recognize that the Fifth Circuit case of *McBee, et al. v. Jim Hogg County, Texas, et al.* 703 F.2d 834 (5th Cir.1983), a case not even cited by defendant in his brief, may cause them problems. They attempt to distinguish that case from the one at bar.

The *McBee* case distinguishes the holding of the United States Supreme Court in *Elrod, supra.* In the *Elrod* case, the Supreme Court held that patronage dismissals of public employees—that is, discharging employees on a partisan political basis—infringed First Amendment interests. The case involved the sheriff's department of Cook County, Illinois, an office with some 3,000 employees. Employees of the sher-

iff's office which had been held by a Republican were discharged or threatened with discharge after a Democrat sheriff assumed office, solely because they were not members of or supportive of the Democrat party. The court held that the Constitution proscribes discharge of non-civil service employees solely because they did not support and were not members of the political party of the newly elected sheriff or because they had failed to obtain the sponsorship of the leaders of that party. However, the effect of that opinion was limited by language in Justice Stewart's concurring opinion. It is generally conceded that the holding in *Elrod* is that a "non-policy making, non-confidential government employee" could not be discharged from a job that he was satisfactorily performing, upon the sole ground of his political beliefs. *Elrod v. Burns, supra,* 427 U.S. at 374–75, 96 S.Ct. at 2690.

In *Branti, supra,* the Supreme Court held that non-policy making, non-confidential assistant public defenders appointed by a public defender who was a Republican could not be terminated by the newly appointed Democrat public defender solely on the ground of their political beliefs.

The Court of Appeals for the Fifth Circuit, *en banc,* in the *McBee v. Jim Hogg County, Texas, supra,* case recognized the Supreme Court's holdings in *Elrod* and *Branti,* but distinguished the holdings of those cases on their facts, and declined to apply the doctrines announced to the termination of deputy sheriffs and a dispatcher-secretary by the newly elected sheriff of Jim Hogg County.

In so doing, the court indicated a belief that there was a great deal of difference between a sheriff's department in a county the size of Cook County, Illinois, and that of Jim Hogg County with a population of less than 6,000 persons. Likewise, the court recognized that the principles that might apply to the sheriff's department of Cook County, Illinois, with 3,000 employees, might not necessarily apply to the sheriff's department of Jim Hogg County

which had a sheriff, six field deputies, four dispatchers and three custodians.

Because the court believes that the Fifth Circuit Court of Appeals, *en banc*, has stated the problem that exists in a small, rural county, much better than this court could, we take the liberty of quoting liberally from that opinion. The court said:

The deputy sheriff in a small county, unlike one of some 550 assistants in a larger county, possesses a much more significant role in the community as a member of law enforcement. Unlike the large office where one's duties may be limited to the specialized functions associated with the numerous divisions in an office of such size, the small county deputy performs virtually all the duties attendant to the actual duties of the sheriff himself. His functions are highly discretionary and more than "the simple exercise of ministerial competence." (citations omitted.) Each of his actions, as varied as they may be, represent the implementation of policies of the sheriff's department as a whole.

It is not uncommon in the small community for a candidate to seek the office of sheriff on a platform espousing "a change." These "changes" are reflected by the very attitudes and actions of the very few officers whom the new sheriff has the power to appoint. The candidate is elected by voters who fully expect and demand such "changes" to be made. "[T]he freedom of voters to structure their representative government," *see Branti v. Finkel, supra*, 445 U.S. at 534, 100 S.Ct. at 1303 (Powell, J., dissenting), is a substantial governmental interest seriously infringed in the small county situation if a newly elected sheriff was unable to make a "change" by replacing those few deputies viewed by the voting public as the "alter ego" of the administration just voted out of office.

█ Any elected official is responsible for employing those individuals whose actions will ensure that his policies are carried out. *Newcomb v. Brennan, supra* 558 F.2d [825] at 830-31. The decisions of those individuals should conform to the broad objectives which the elected official chooses to pursue. *Id.* In the small county situation, the need for confidence in one's employees is heightened since an official must rely on perhaps six, as opposed to six hundred, officials to carry out his objectives. Such is even more apparent in the law enforcement area where a sheriff's deputies are often called upon to make on-the-spot split-second decisions effectuating the objectives and law enforcement policies which a particular sheriff has chosen to pursue. The need for confidence and loyalty in one's employees—particularly where so few are involved in a position of heightened public scrutiny—is paramount. If a sheriff in a small county questioned his confidence in and the loyalty of his six-man staff of deputies, the ability of such an office to effectively perform its duties would be severely hampered. Moreover, should an "open rift" ever develop between a sheriff and his deputies—"even if the basis for the feud were unrelated to actual job performance"—the office would become nothing more than "a battleground in which little was accomplished, to the detriment of the citizens ...." *Newcomb v. Brennan, supra.* The absence of loyalty of deputies to the sheriff, but rather to another candidate, has been found to create "an atmosphere of tension, distrust and suspicion within the office" so as to make the government's interest in "promoting the efficiency of the public service it performs through its employees" outweigh first amendment concerns. *Serna v. Manzano*, 616 F.2d 1165, 1166 (10th Cir.1980). Such actions may be "disruptive and interfere[ ] with the efficient operations of the Sheriff's office." *Id.* at 1167.

\*     \*     \*     \*     \*     \*

Furthermore, the present situation differs from that in *Branti* where only a nine-man public defenders office was involved. In *Branti*, the "primary, if not only, responsibility of the assistant public defender" was to represent individual citizens in controversy with the state,

*Branti v. Finkel, supra,* 445 U.S. at 519, 100 S.Ct. at 1295, a situation far different from that of the deputy sheriff whose loyalty is to his employer, the sheriff.

\*　　\*　　\*　　\*　　\*　　\*

In this connection, we take notice of the intimate relationship that undoubtedly exists between the sheriff and his deputies in a small county like Lee County, Virginia. The efficient operation of the sheriff's office in Lee County requires a high degree of mutual cooperation, confidence and support. None of these elements is likely to be present where the parties are bitter political antagonists. By contrast, the relationship between the sheriff and his deputies in the large Cook County, Illinois office is likely to be far more impersonal.

The court immediately recognizes that a substantial argument can be made that the functions of a deputy sheriff as described in *McBee, supra,* are different than those of an employee whose only duty is to run a road grader and maintain the roads of Searcy County. This argument admittedly has initial appeal, but the court believes that, upon further reflection, there is a great deal of similarity between the facts of the case at bar and those present in Jim Hogg County, Texas. As the court has already indicated, anyone who has ever resided in a predominantly rural county, as the author of this opinion has, immediately recognizes, as already indicated, that to most of the voters of a rural county, the road crew who they see hopefully frequently but often infrequently, is the county judge. Maintaining the county roads is his job and, in most cases, whether he stays in office depends upon how well he does that job and in what manner the citizens of the rural areas perceive that his employees have treated them. In short, the individual members of the road crew are, in fact, the "alter ego" of the county judge.

As an example of the "facts of life of Searcy County," the court need only cite the testimony of Alva Bohannan, a road grader operator who had worked under three different county judges. He testified that Loren Horton and Ernest Adams, both already identified by the court as county Republican committeemen, refused to grade some rural roads because only Democrats resided along them. He also testified that Loren Horton had offered voters gravel for votes for Willis Dale Horton, and that he had heard Horton say that he wouldn't work for the s.o.b. (Duford Taylor) even if he asked him to. By citing this testimony, the court does not intend to indicate that it either believes or disbelieves it, because it is not necessary for it to make such a finding in that respect, but it is cited simply to show that the road grader operators are generally perceived by the voting public in Searcy County, Arkansas, to represent the county judge. Likewise, the alleged statement by Horton that he would not work for the s.o.b. even if he was asked to, exemplifies the problem that the court in *McBee* was addressing when it discussed the fact that a rift in a small office would result in the office becoming nothing more than "a battleground in which little was accomplished to the detriment of the citizens."

In short, the court believes and finds that the plaintiffs in this case had their jobs simply because their political party was in office prior to January of 1983. They were beneficiaries of the system that had been in effect in that county undoubtedly since the beginning of the history of the county. Because of the nature of the county, they were not only arms of, but agents of and, in fact, the alter ego of the county judge. When the voters elected a new county judge, they undoubtedly expected "a change" and in the words of the *McBee* court: "The candidate is elected by voters who fully expect and demand 'changes' to be made." It may be that when the voters turned Willis Dale Horton out of office, a majority was dissatisfied with the maintenance of the county roads, the primary function of the county judge in their eyes, and they expected a complete change. Thus, the court finds, as did the *McBee*

court, that the policy making, confidential government employee exception of the *Elrod* case, *supra,* applies, and that defendant did not violate plaintiffs' First Amendment rights even if they were terminated because of their political affiliation.

That leaves for determination the effect of Resolution No. 3 of the Quorum Court of Searcy County dated October 20, 1977. This resolution purports to adopt personnel policies for the county. These policies contain the following paragraph:

2. Dismissals—An employee who gives unsatisfactory service, who is guilty of conduct unbecoming the County or himself, shall be subject to dismissal. In such cases, the employee shall be given a fair hearing before his or her immediate supervisor and the county judge. Every employee shall have the right to appeal to the county judge and shall be notified in writing seven (7) days prior to the date, time, and place of his appeal.

Plaintiffs contend that the resolution and purported personnel policy gave them a property interest in their job which required a due process hearing before they were dismissed, *citing Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and *Gold Cross Ambulance and Transfer v. City of Kansas City,* 705 F.2d 1005 (8th Cir.1983). Defendant contends that the personnel policy, having been adopted by a mere resolution rather than a county ordinance, requires no executive action, *citing* ARK.STATS.ANN. § 17–4002(10), which defines a resolution as being a mere expression of a wish of the quorum court and that the statute provides that such a resolution shall not serve to compel any executive action.

■ The court believes that, irrespective of what they called it, the Searcy County Quorum Court, when they passed Resolution No. 3, probably intended to enact a personnel policy which would be applicable to all county employees. However, unless the passage of such resolution legally and effectively granted to the plaintiffs the contractual right to their employment or a legally enforceable expectancy of continued

employment, it grants to them no property interest in their employment protected by the due process clause of the Constitution. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann, supra.*

Irrespective of what the intention of the quorum court was when it passed the "resolution," the court finds that it does not grant to the plaintiffs the legally enforceable expectancy of continued employment necessary to establish a property interest claim under the Constitution. Amendment 55 to the Arkansas Constitution establishes the relative functions of the quorum court and the county judge. The quorum court has certain specified legislative functions, and the county judge, as the chief administrator of the county, has certain well defined duties and responsibilities. As the Arkansas Supreme Court pointed out in *McCuen v. Jackson,* 265 Ark. 819, 581 S.W.2d 326 (1979), Section 3 of Amendment 55 to the Arkansas Constitution specifically gives the county judge the power to "hire county employees, except those persons employed by other elected officials of the county." The enabling statute for Amendment 55 contains this pertinent language:

(B) The General Assembly further determines that the executive powers of the County Judge as enumerated in Section 3 of Amendment 55 are to be performed by him in an executive capacity, and not by order of the county court.

In the exercise of the executive powers of the County Judge as hereinabove enumerated, the County Judge shall follow the procedures established below:

\*     \*     \*     \*     \*     \*

(5) Hire county employees except those persons employed by other elected officials of the county. The County Judge, as the chief executive officer of the county, shall be responsible for the employment of the necessary personnel or for the purchase of labor or services performed by individuals or firms employed by the county or an agency thereof, for salaries, wages, or other forms of

compensation. [Ark.Stat.Ann. § 17–3901 (Repl.1977).]

Thus, the court finds that the Arkansas Constitution clearly gives the county judge the right, duty and obligation to hire and naturally the concomitant duty to fire his employees, including road department employees. It may be, as defendant argues, that the quorum court did not intend by Resolution No. 3 to do anything other than express its wishes, but even if that is not the case, the court finds that an attempt by the legislative body to dictate the hiring and firing of the county judge's employees would be violative of Amendment 55 to the Arkansas Constitution. Thus, the purported personnel policies would not be enforceable and do not give the plaintiffs an expectancy of continued employment and, thus, no enforceable property right in their employment.

Not only did the plaintiffs in this case not have any legally enforceable expectation of continued employment, the court is convinced that they had, in reality, no such expectation, even in their own minds. They were a part of "the system." They were hired because of "the system" and they knew that when the county judge that employed them left office, they would probably be replaced just as they had been in the past after other changes of administrations, and as their predecessors in their very jobs were when their judge, Willis Dale Horton, defeated his predecessor in office.

The court finds that the plaintiffs should take nothing on their complaint herein and that it should be dismissed with prejudice. A separate judgment will be entered consistent with this opinion.