767 F.2d 471
 Loren HORTON, J.C. Chadwick, Donald L. Ragland, J.D. Freeman
and Ernest Adams, Appellants,
v.
Duford TAYLOR, Individually and in the Official Office of
County Judge of Searcy County, Arkansas, Appellee.
 No. 84-1565.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 11, 1985.
Decided July 11, 1985.
 
 Eddie Morgan, Clinton, Ark., for appellants.
 Charles E. Clawson, Jr., Conway, Ark., for appellee.
 Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and SACHS,* District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The issue before us is whether five road-grader operators in a small, rural Arkansas county were wrongly fired because they were Republicans in a Democratic administration. The district court concluded they were not, finding a small-county exception to the rule of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), which prohibits patronage dismissals except where party afiliation is necessary to do a job effectively. We conclude that the operators were not excepted from the rule and reverse and remand for further findings.
 
 
 2
 Loren Horton, J.C. Chadwick, Donald L. Ragland, J.D. Freeman and Ernest Adams are road-grader operators who were hired by Willis Dale Horton, a Republican, when he was elected County Judge of Searcy County, Arkansas. Horton was defeated in the general election of 1982 by Duford Taylor, a Democrat, who then fired nine of the seventeen full-time employees of the county road crew. Five of those nine, the individuals now before us, brought suit against Taylor under 42 U.S.C. Sec. 1983 (1982), claiming they were fired because they supported Horton in the election.[1]
 
 
 3
 The district court in a bench trial found that there was no property or liberty interest that would have prevented their discharge unless the five were terminated for exercising their constitutionally protected rights of political expression and association. It then turned to this latter question, first finding that Searcy County, a predominantly rural county with a population of less than 9,000 located in the mountainous regions of north Arkansas, is almost evenly split between Republicans and Democrats, a division causing
 
 
 4
 frequent swing[s] in the fortunes of its elected officials. The county judge is the chief administrative officer of counties in Arkansas, and is elected to two-year terms. According to the testimony at the trial, the office of county judge of Searcy County changes almost every two years, with the Democrats and Republicans virtually switching places each successive term. For example, Willis Dale Horton, the Republican County Judge of Searcy county prior to the election of the defendant, Duford Taylor, had served a total of five terms (ten years), but rarely if ever during such period served two successive terms.
 
 
 5
 Horton v. Taylor, 585 F.Supp. 224, 225-226 (W.D.Ark.1984).
 
 
 6
 In this volatile, closely-knit political structure, one's party affiliation is apparently a matter of common knowledge. "The evidence appears to be clear that most everyone in the county knew who were Republicans and who were Democrats."[2] Id. at 226. Two of the road-graders--Loren Horton and Ernest Adams--are Republican committeemen. There was testimony that both had refused to grade some roads because only Democrats resided along them and that Loren Horton had offered voters gravel for votes in favor of Willis Dale Horton and had stated in regards to Judge Taylor he "wouldn't work for the son-of-a-bitch if he asked him to." Judge Taylor testified, however, that all five had been dismissed because he knew their work had been unsatisfactory.
 
 
 7
 While the district court took note of this testimony, it did not reach credibility findings regarding it, since it found as a threshold issue that the road-graders were the "alter ego" of the county judge and, hence, not protected by the rule of Elrod-Branti. Judgment was entered for Judge Taylor, from which the road-graders now appeal.
 
 I.
 
 8
 We first address the road-graders' contention that they were improperly dismissed because they were not given a hearing before discharge. They base their contention on a resolution enacted by the quorum court of Searcy County:An employee who gives unsatisfactory service, who is guilty of conduct unbecoming the County or himself, shall be subject to dismissal. In such cases, the employee shall be given a fair hearing before his or her immediate supervisor and the County Judge. Every employee shall have the right to appeal to the County Judge and shall be notified in writing seven (7) days prior of the date, time and place of his appeal.
 
 
 9
 Searcy County Resolution 3 (Oct. 20, 1977). However, under Ark.Stat.Ann. Sec. 17-4002(10) (1980) a resolution by the quorum court is defined as a formal statement of policy used "to express an opinion as to some matter of county affairs and * * * not * * * to compel any executive action." Even if the resolution was intended to carry greater force than this, it has no power in the face of the Arkansas Constitution, amend. 55, Sec. 3, which states that "the County Judge * * * shall * * * hire county employees." (Emphasis added). See Ark.Stat.Ann. Sec. 17-3901(B)(5) (1980) (enabling statute); McCuen v. Jackson, 265 Ark. 819, 581 S.W.2d 326, 327 (1979) (county judge, as an executive officer of the county, is vested with responsibility with respect to hiring county employees). Thus, an Arkansas county judge has "the right, duty and obligation to hire and naturally the concomitant duty to fire his employees, including road department employees." Horton, at 231.
 
 
 10
 The road-graders claim that under Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the quorum court resolution created an objective job expectancy. Perry, recognizing that " 'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms," held that "[e]xplicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.' " 408 U.S. at 601-02, 92 S.Ct. at 2699-2700 (quoting 3 A. Corbin, Corbin on Contracts Sec. 562 (1960)). Here, however, the "promisor"--the quorum court--had no power to do what it sought to do. The effort of another political entity to modify powers specifically and exclusively granted the county judge by the Arkansas Constitution must be judged a nullity. Unconstitutional acts can create no legitimate expectancy. See Smith v. Sorensen, 748 F.2d 427, 432 (8th Cir.1984) (no expectancy created by governmental agent exceeding bounds of authority), cert. denied, --- U.S. ----, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985). Thus, we agree with the district court that since "[p]laintiffs' employment was not under tenure or contract, nor was there was any clearly implied promise of continued employment, * * * plaintiffs had no legitimate claim of entitlement to employment," Horton, at 225, unless their termination violated their first amendment rights.
 
 II.
 
 11
 We turn to the primary question before us: were the road-graders terminated because they exercised constitutionally protected rights of political expression and association? The resolution of the question turns on the reach of Elrod and Branti; and whether, as the district court concluded, there is a small-county exception to the rule of those cases.[3]
 
 
 12
 Elrod v. Burns held unconstitutional the dismissal of non-civil-service employees of the sheriff's office of Cook County, Illinois, solely because the employees were not affiliated with or sponsored by the Democratic Party. The concurrence, which made possible the 5-3 decision, did not join "the plurality's wide-ranging opinion" regarding "the broad contours of the so-called patronage system" and found unconstitutional only the discharge or threat of discharge "upon the sole ground of * * * political beliefs" of "a nonpolicymaking, nonconfidential government employee." 427 U.S. at 374-75, 96 S.Ct. at 2690 (Stewart, J., concurring).
 
 
 13
 Four years later, Branti v. Finkel clarified the point at which Elrod comes into play. Branti involved two assistant public defenders who were among six dismissed on a staff of nine because they were Republicans. In affirming the district court's determination that the dismissals were unconstitutional, the Court reframed the appropriate test: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. Thus, explained the Court, while a governor of a state might demand that his assistants "who help him write speeches, explain his views to the press, or communicate with the legislature" share his party commitments, id., such a demand would not be appropriate for state university football coaches "since no one could seriously claim that Republicans make better coaches than Democrats," or for assistant public defenders who help individual, indigent clients prosecuted by the government. Id.
 
 
 14
 In the present case, the district court found that "the policymaking, confidential government employee exception of the Elrod case" applied. Horton, at 230. It relied heavily on its perception of the political realities of small, rural Arkansas counties, of which it took judicial notice:
 
 
 15
 Rural residents see the operator of the road grader, talk with him, have coffee or lunch with him, and, as far as many of them are concerned, he "is" the county and the county judge. If the roads aren't properly maintained or if a citizen's mail box is knocked down and run over, the grader operator is not the one blamed. It's the judge's fault.
 
 
 16
 Horton, at 226. Thus, it reasoned, "the road crew which the county judge employs is, in effect, his 'alter ego.' " Id. at 226.
 
 
 17
 In addition, the district court quoted extensively from the Fifth Circuit's decision in McBee v. Jim Hogg County, 703 F.2d 834 (5th Cir.1983), vacated, 730 F.2d 1009 (5th Cir.1984) (en banc). In that panel decision later vacated by the Fifth Circuit en banc after the district court's decision here, the dismissal of deputy sheriffs in a small, rural Texas county was held constitutional since "the small county deputy performs virtually all the duties attendant to the actual duties of the sheriff himself" thus making "his functions * * * highly discretionary and more than 'the simple exercise of ministerial competence.' " 703 F.2d at 839 (quoting Newcomb v. Brennan, 558 F.2d 825, 830-31 (7th Cir.), cert. denied, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977) ). The small county deputy's actions, then, "varied as they may be, represent the implementation of policies of the sheriff's department as a whole." Id. The McBee I court further reasoned that "the need for confidence and loyalty in one's employees--particularly where so few are involved in a position of heightened public scrutiny--is paramount. * * * [S]hould an 'open rift' ever develop between a sheriff and his deputies * * * the office would become nothing more than 'a battleground in which little was accomplished, to the detriment of the citizens....' " Id. at 839-40 (quoting Newcomb, 558 F.2d at 830-31).
 
 
 18
 Also, the fact that not only the county but the actual political unit was small in size was found significant:
 
 
 19
 [W]e take notice of the intimate relationship that undoubtedly exists between the sheriff and his deputies in a small county * * *. The efficient operation of the sheriff's office * * * requires a high degree of mutual cooperation, confidence and support. * * * By contrast, the relationship between the sheriff and his deputies in the large Cook County, Illinois office is likely to be far more impersonal.
 
 
 20
 Ramey v. Harber, 589 F.2d 753, 756-57 (4th Cir.1978), cert. denied, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979), quoted in McBee, 703 F.2d at 841.
 
 
 21
 Finally, in a small community a candidate may seek office
 
 
 22
 on a platform espousing "a change." These "changes" are reflected by the very attitudes and actions of the very few officers whom the new sheriff has the power to appoint. * * * [Thus,] "the freedom of voters to structure their representative government," * * * is * * * seriously infringed in the small county situation if a newly elected sheriff was unable to make a "change" by replacing those few deputies viewed by the voting public as the "alter ego" of the administration just voted out of office.
 
 
 23
 703 F.2d at 839 (quoting Branti, 445 U.S. at 534, 100 S.Ct. at 1303).
 
 
 24
 Of course, campaigning on a platform of change is not a phenomenon confined to small, rural counties. Justice Powell in his Branti dissent questioned how effective such campaign promises would be in the post-Branti era:
 
 
 25
 Patronage--the right to select key personnel and to reward the party "faithful"--serves the public interest by facilitating the implementation of policies endorsed by the electorate. * * * The Court does not recognize that the implementation of policy often depends upon the cooperation of public employees who do not hold policymaking posts. As one commentator has written, "What the Court forgets is that, if government is to work, policy implementation is just as important as policymaking. No matter how wise the chief, he has to have the right Indians to transform his ideas into action, to get the job done."
 
 
 26
 445 U.S. at 529-30, 100 S.Ct. at 1300-01 (Powell, J., dissenting) (footnotes omitted) (quoting Peters, A Kind Word for the Spoils System, The Washington Monthly, Sept.1976, at 30). Nonetheless, while it is clear from the record that patronage dismissals were common in Searcy County for many years, and perhaps even that "Searcy County virtually had two road crews, one for Republican years and another for Democrat years," Horton, at 226, the prevalence of the practice alone, even where "change" is achieved, cannot justify its continuance unless an exception to the rule of Elrod-Branti is appropriate. See Barnes v. Bosley, 745 F.2d 501 (8th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985).
 
 
 27
 The size of the office alone in this case cannot justify such an exception. Judge Taylor is responsible for some seventeen employees. Yet, Branti itself involved only nine assistant public defenders. Further, it cannot seriously be argued that the relationship between the county judge and small crews of road-graders who spend most of their time, if they are performing their jobs properly, working alone on rural roads in the reaches of the county is more "intimate" than that in Branti of a public defender and his nine assistants who had "a close professional and necessarily confidential association." Branti, 445 U.S. at 521, 100 S.Ct. at 1296 (Stewart, J., dissenting). While the Fourth Circuit's decision in Ramey, which both the district court and the McBee I court quoted with approval, did point to the "intimate relationship" between a sheriff and his deputies in a small county, that case was decided before Branti. As the Fourth Circuit has more recently made clear:
 
 
 28
 Aside from the fact that the small-size distinction in Ramey was entirely by way of dictum, Branti, which followed Ramey, held that raw patronage discharges in a nine-person public defender's office were not justified under the Elrod test as therein modified. To the extent, therefore, that the Ramey small-size distinction may have had any vitality when decided under Elrod, we believe it has since been completely undercut by Branti's refinement of the Elrod principle.
 
 
 29
 Jones v. Dodson, 727 F.2d 1329, 1338 n. 14 (4th Cir.1984).
 
 
 30
 As to loyalty, Branti requires that a distinction be drawn between political loyalty and other kinds. Justice Stewart dissented in Branti, noting that he could think "of few occupational relationships more instinct with the necessity of mutual confidence and trust than that kind of professional association" between the lawyers involved in Branti. 445 U.S. at 521, 100 S.Ct. at 1296. The Court replied that it could not "accept the proposition * * * that there cannot be 'mutual confidence and trust' between attorneys, * * * unless they are both of the same political party. To the extent that petitioner lacks confidence in the assistants he has inherited from the prior administration for some reason other than their political affiliations, he is, of course, free to discharge them." 445 U.S. at 520 n. 14, 100 S.Ct. at 1295 n. 14. There is, obviously, a point at which the two types of loyalty mingle or are merged--a point also at which an employee is likely to be in a confidential or policymaking position or otherwise so situated that party affiliation bears on his job performance.[4] It may be that partisan feelings will so affect an employee's work that his effectiveness and efficiency will be influenced--a consideration we will presently discuss. Branti, however, makes clear that the loyalty required for "raw political patronage," Jones, 727 F.2d at 1335--which is that type of loyalty involved here--alone will not justify a patronage dismissal. 445 U.S. at 520, 100 S.Ct. at 1295.
 
 
 31
 Unlike the deputy sheriffs in McBee, as the district court implicitly recognizes, the operators here did not have "virtually all the duties" of the county judge himself. Nor could their jobs be described as "highly discretionary." They graded roads. The Branti test is a functional one, focusing on the actual duties an employee performs. As with the example of the football coach in Branti, no one can seriously claim that a Republican or Democrat makes a better road-grader as such. The manipulation of heavy machinery over unpaved rural roads is an apolitical task. See Bever v. Gilbertson, 724 F.2d 1083, 1088 (4th Cir.) (lower echelon employees of highway department were neither confidential employees nor policymakers), cert. denied, --- U.S. ----, 105 S.Ct. 349, 83 L.Ed.2d 285 (1984).
 
 
 32
 An exception to Elrod-Branti can only exist, then, if the road-graders here were something more than just road graders--if they were road-graders "plus," and not merely manipulators of machinery but also so closely linked to the county judge that they became his "alter ego." The district court reached the conclusion that this was the case by drawing on his own experiences and taking judicial notice[5] that
 
 
 33
 to most of the voters of a rural county, the road crew who they see hopefully frequently but often infrequently, is the county judge. Maintaining the county roads is his job and, in most cases, whether he stays in office depends upon how well he does that job and in what manner the citizens of the rural areas perceive that his employees have treated them. In short, the individual members of the road crew are, in fact, the "alter ego" of the county judge.
 
 
 34
 Horton, at 229.
 
 
 35
 However, while the county judge may be held to high account for what his employees do, it does not follow that each employee is, therefore, the judge's second self, his confidential representative. If the duties of the road-graders were coextensive with or the equivalent of those of the county judge, the argument might have more force. As it is, since it is clear from the record that the road-graders had specific, assigned tasks and did not play a part in the management of the force assembled to maintain the county roads, the conclusion must be rejected.[6] To hold otherwise would require us to reject the functional test of Branti and essentially hold that in any office of a small, rural county the unwritten, personal relationship between the office-holder and his subordinates as perceived by the residents of the county could override the specific, actual duties of the employees. To so hold would essentially create a general small-county exception to the rule of Elrod-Branti. We are not prepared to take this step. The duties of the road-graders involved neither "policymaking related to 'partisan political interests' * * * [nor] access to confidential information bearing whatsoever on partisan political concerns." Jones, 727 F.2d at 1338 (quoting Branti, 445 U.S. at 519, 100 S.Ct. at 1295). Thus, we hold that the dismissal of the road-graders is not excepted from the rule of Elrod-Branti.
 
 
 36
 In so holding, we are aware that courts disagree whether such determinations are matters of fact or of law--and are also aware of the implications of this issue for the degree of deference we must pay the district court's determinations. See Fed.R.Civ.P. 52(a). For example, the Jones court, while acknowledging that some discharge cases may involve "disputed questions of fact respecting the exact nature of an employee's duties," 727 F.2d at 1336 n. 9, nonetheless held that the ultimate constitutional question is one of law. Id. at 1336; see also Mummau v. Ranck, 687 F.2d 9 (3d Cir.1982) (matter of law). Other courts, however, have held that whether an employee was in a policymaking position is a factual issue, see Soderbeck, 752 F.2d at 288-89; Stegmaier v. Trammel, 597 F.2d 1027, 1034 n. 8 (5th Cir.1979), while Delong v. United States, 621 F.2d 618, 623 (4th Cir.1980), suggests that the issue of whether a particular position is protected "may be resolved as one of law or fact depending upon the evidence adduced."
 
 
 37
 Of course, after Branti, whether an employee was in a confidential or policymaking position is not a dispositive finding; rather, the ultimate constitutional issue is whether, taking into account the specific facts of any particular situation (including whether policymaking or confidential relationships were involved), "party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518, 100 S.Ct. at 1295. Thus, the issue may very well be one in which a mixture of historical facts to be determined by the trier of fact and a test of constitutional law is involved. In many, perhaps most, cases the dispute will lie over the nature of the specific job involved, and such factual determinations will resolve the case. Here, however, the nonpolicymaking, nonconfidential nature of the plaintiffs' jobs as such is clear from the record, as is the irrelevance of party affiliation to the effective operation of a roadgrading machine. The district court's conclusions depend not on factual findings regarding particular jobs but, rather, on the general implications of the plaintiffs' public employment within the Elrod-Branti constitutional framework (i.e., the "alter ego" theory). On the record before us there is simply insufficient evidence to raise an issue for the trier of fact as to whether the plaintiffs' jobs as such were of the type that required political affiliation to be effectively performed.[7] Thus, in this case we believe that we properly may rule on the issue as a matter of law.III.
 
 
 38
 At this point, the case must be remanded to the district court for further findings. The district court should first determine the reason or reasons for the dismissal of each of the road-graders. Because of its "alter ego" approach, the district court found it unnecessary to make such specific findings. However, since we have determined that a general patronage exception is not applicable here, such findings must be made. The road-graders offered evidence that the dismissals were solely patronage-based.[8] Judge Taylor testified, however, that the road-graders were not retained because their work was unsatisfactory.[9] There was also some testimony that at least suggested two of the road-graders--Loren Horton and Ernest Adams--may have been dismissed because of their expression of ideas dealing with matters of legitimate public concern. For example, Judge Taylor himself testified that one reason Horton was dismissed was because he had "always been very vocal. * * * He's radical. * * * He keeps turmoil going, even in the community." Both Horton and Adams were Republican committeemen, a position which may have significance in this case. It may be that in Searcy County the position is little more than a public manifestation of party membership, bearing essentially only ceremonial and honorary significance. On the other hand, it may be that Horton and Adams, because of their positions, played a more active role in the 1982 campaign. If so, in the course of campaigning, they may have made statements on matters of public concern. They may also have made statements that were primarily the expression of personal invective, such as that recognized by the district court and which we have noted above. The district court should determine if such statements were made and, if so, if such expressions of ideas led to or contributed to the dismissal of any of the road-graders. As the record is somewhat incomplete on this point, if the court deems it necessary, additional testimony should be taken.
 
 
 39
 The legal standards to be applied by the district court depend on these preliminary factual findings. If the district court should find that Judge Taylor's testimony was not credible and that some or all of the road-graders were dismissed solely because they were Republicans, then the case for those individuals would fall squarely under the rule of Elrod-Branti. As we have already determined as a matter of law that the road-graders were not excepted from the rule, should the court reach this finding, judgment should then be entered for those plaintiffs.
 
 
 40
 If the district court should find that certain employees were dismissed because "of overt activity involving arguably protected speech (either solely or in addition to party affiliation)," Jones, 727 F.2d at 1337, then it should apply the balancing test of Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), as more recently developed in Connick v. Meyers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Should the test be appropriate, the next step for the district court would be for it to determine if those expressions were, in fact, matters of public concern. The Court cautioned in Connick that
 
 
 41
 when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.
 
 
 42
 461 U.S. at 147, 103 S.Ct. at 1690. If the plaintiffs' articulations did not rise above the level of an expressed personal dislike for the county judge, (e.g., "I wouldn't work for the son-of-a-bitch if he asked me"), it may be, taking into account the form and context of the statements, see id. at 147-48, 103 S.Ct. at 1690, that they would not carry public import. We express no opinion on the resolution of this potential issue, however, and, indeed, it may be that considering the size and nature of the groups to whom the statements were made, and that the statements may have been made while the plaintiffs were fulfilling any number of functions incumbent upon their positions as committeemen, that Horton and Adams engaged in conduct of public import that was a motive in their dismissal. Should the district court find the activity was of public concern, it then should balance
 
 
 43
 the degree of "public concern" legitimately had in the particular expression of ideas--as measured by the expression's content and context--against the degree to which the employee's conduct is justifiably viewed by the public employer as an actual or threatened disruption of the conduct of government operations for which the employer is responsible.
 
 
 44
 Jones, 727 F.2d at 1334. Should this step be reached, the Court's additional caution should be heeded that expressions which "touch[ ] upon matters of public concern in only a most limited sense * * * [do] not require that [the public official] tolerate action which he reasonably believe[s] would disrupt the office, undermine his authority, and destroy close working relationships." 461 U.S. at 154, 103 S.Ct. at 1693.
 
 
 45
 We reiterate, however, that the district court should engage in a Pickering-Connick balancing test only if overt activity extending beyond the mere fact of political affiliation was a motivating factor in any particular discharge. We cannot agree with the Fifth Circuit in McBee II that the Pickering balancing test must now be used to resolve all "public employee discharge or non-renewal cases," and that Elrod and Branti merely represent one end of the spectrum "where little, if any, weighing is called for." McBee v. Jim Hogg County, 730 F.2d 1009, 1014 (5th Cir.1984) (en banc). The practical effect may be negligible, since, as the McBee II court points out, "no countervailing considerations appear" for employees who "suffered discharge for pure political beliefs." Id. If there is nothing to be balanced, a balancing test is of little use.[10] Nonetheless, we believe the distinction urged by the dissent in McBee II should not be lost:
 
 
 46
 Elrod and Branti, * * * involved retaliation for political beliefs and associations--free expression that did not threaten the efficient conduct of public office unless the employees' position required political loyalty. Pickering, like Connick and similar pre-Connick cases, involved speech that arguably threatened the integrity of employer-employee relations, and therefore each case required the interests to be balanced anew.
 
 
 47
 Id. at 1022 (footnote omitted). Thus, we agree with the analysis of the Fourth Circuit in Jones v. Dodson: "If discharge solely because of party affiliation is found, this will involve applying the narrow Branti justification test. If a discharge for overt expressive conduct is found, it will involve application of the Pickering-Givhan-Connick balancing test." 727 F.2d at 1337.
 
 
 48
 Finally, if the district court should find that certain road-graders were dismissed for mixed motives, one motive implicating first amendment interests (political affiliation and/or overt speech) and one or more being unrelated to the first amendment,[11] then the district court should apply the test of Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and determine whether Judge Taylor showed that some or all of the discharges "would have been made in any event for reasons unrelated to any exercise of protected first amendment rights." Jones, 727 F.2d at 1335. If so, then judgment should be entered for him.
 
 
 49
 In Barnes v. Bosley, 745 F.2d 501 (8th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985), we laid out the procedure in such cases when discharge for political affiliation was mixed with other motives:
 
 
 50
 Initially, the burden is on the plaintiff to show that his or her conduct is constitutionally protected and that this conduct was a substantial or motivating factor in the action taken against him or her. The defendant may then defeat the plaintiff's claim by demonstrating that the same action would have been taken in the absence of the protected conduct.
 
 
 51
 Id. at 507 (citing Mount Healthy, 429 U.S. at 287, 97 S.Ct. at 576. As we specifically noted in Barnes,
 
 
 52
 [a]lthough Elrod and Branti were cases in which the Supreme Court accepted the factual finding below that political affiliation was the sole motive for firing the plaintiffs, we see no reason to apply a stricter standard for political affiliation cases than is applied in other first amendment cases. In the instant case, therefore, once the plaintiffs established that their political affiliation was a motivating factor in their dismissals, the burden shifted to the defendants to show by a preponderance of the evidence that the plaintiffs would have been discharged in any event.
 
 
 53
 Id. (footnote omitted). Mount Healthy itself, of course, concerned overt expressive conduct, and Barnes extended its principle to political affiliation cases. Thus, it is clear that in this circuit mixed-motive discharges of non-civil-service public employees who claim first amendment protection are to be judged under Mount Healthy.
 
 
 54
 In short, the disposition of this case upon remand will depend, first, on whether Elrod-Branti or Pickering-Connick should be applied to judge the conduct the road-graders allege is protected, and, second, on whether, in any event, the discharges in each particular case stemmed from mixed motives to be evaluated under the Mount Healthy standard.
 
 
 55
 We remand for further findings in light of the above opinion.
 
 
 56
 BOWMAN, Circuit Judge, dissenting.
 
 
 57
 The opinion of the Court holds that as a matter of law the dismissal of the road-graders is not excepted from the rule of Elrod-Branti. Acknowledging that disagreement exists among the circuits as to whether such determinations are questions of fact or law, ante at 478, the Court concludes that the record contains insufficient evidence to raise a factual issue in this respect and, hence, that "we properly may rule on the issue as a matter of law." Ante at 478. The problem with the Court's approach is that it effectively establishes a new rule of Constitutional law: one appointed to a low-level government job on the basis of party affiliation can never be fired on the basis of party affiliation. I find nothing in Elrod or Branti or any of their progeny that would compel--or even provide a coherent rationale for--such an extraordinary reading of the Constitution.
 
 
 58
 Essentially, today's decision reverses the results of an election that the plaintiffs and their party lost in 1982. The District Court specifically found that "the plaintiffs in this case had their jobs simply because their political party was in office prior to January of 1983. They were beneficiaries of the system that had been in effect in that county undoubtedly since the beginning of the history of the county." Horton v. Taylor, 585 F.Supp. 224, 229 (W.D.Ark. Apr. 6, 1984). The District Court also specifically found that the road-grader operators "are generally perceived by the voting public in Searcy County, Arkansas, to represent the county judge." Id. at 229. The court further found that:
 
 
 59
 Not only did the plaintiffs in this case not have any legally enforceable expectation of continued employment, the court is convinced that they had, in reality, no such expectation, even in their own minds. They were a part of 'the system.' They were hired because of 'the system' and they knew that when the county judge that employed them left office, they would probably be replaced just as they had been in the past after other changes of administrations, and as their predecessors in their very jobs were when their judge, Willis Dale Horton, defeated his predecessor in office.
 
 
 60
 Id. at 231.
 
 
 61
 I would hold that these findings, summed up in the District Court's conclusion that the members of the road crew are in fact the "alter ego" of the county judge, amount to a finding of Branti justification, i.e., to a finding of fact that party affiliation is an appropriate requirement for the jobs in question. Although the record in support of these findings is not overwhelming, I do not agree that the evidence on these matters was insufficient to raise an issue for the trier of fact. I believe that the subsidiary findings as well as the ultimate finding of Branti justification should be reviewed under the clearly erroneous standard. Further, I believe that if reviewed under that standard, the findings in this case should be upheld. See Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Accordingly, I would affirm the judgment of the District Court.
 
 
 
 *
 The Honorable HOWARD F. SACHS, United States District Judge for the Western District of Missouri, sitting by designation
 
 
 [1]
 Judge Taylor insisted throughout the hearing that he did not fire the plaintiffs but, rather, simply told them at the time he took office "that they did not have a job." The distinction is quite subtle. In portions of his testimony, Judge Taylor appears to suggest that a general process of termination and reappointment took place during the change in administration. Even if such a process occurred, discharges under such a procedure are not, by that fact alone, excepted from the Elrod-Branti rule. See McBee v. Jim Hogg County, 730 F.2d 1009, 1015 (5th Cir.1984) (irrelevant whether employees were terminated by "failure to rehire" instead of "dismissal")
 
 
 [2]
 This general awareness, for example, is apparent from the following colloquy at the hearing:
 Q Mr. Adams, if I understand your testimony, when you went out to the shop that day, the folks that were there looked like Democrats?
 A Yes, they did.
 Q You don't have any idea who they voted for, of your own personal knowledge? Don't assume.
 A That would be like my knowledge of the sun coming up in the east and setting in the west. I know it, but as far as proof, no.
 Q But you don't know, do you?
 A Well, I know like the sun rises in the east.
 Q You know they looked like Democrats?
 A Well, they was affiliated with the Democrat party. Let me put it that away.
 
 
 [3]
 We examine below a number of recent cases dealing with this issue and, in particular, acknowledge the able analysis of the Fourth Circuit in Jones v. Dodson, 727 F.2d 1329 (4th Cir.1984). Many of these cases, including this court's decision in Barnes v. Bosley, 745 F.2d 501 (8th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985), were not available to the district court at the time its opinion was issued
 
 
 [4]
 For example, as Judge Posner has trenchantly pointed out: "You cannot run a government with officials who are forced to keep political enemies as their confidential secretaries * * *. If Rosalyn Carter had been President Carter's secretary, President Reagan would not have had to keep her on as his secretary." Soderbeck v. Burnett County, 752 F.2d 285, 288 (7th Cir.), cert. denied, --- U.S.----, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985)
 
 
 [5]
 Rule 201 of the Federal Rules of Evidence provides that "a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The Notes of the Advisory Committee state that "with respect to judicial notice of adjudicative facts, the tradition has been one of caution in requiring that the matter be beyond reasonable controversy." The facts judicially noticed appear to lie at the boundaries of these strictures
 
 
 [6]
 There is a sense in which all the employees of the roads department of Searcy County might collectively be metaphorically viewed as the "alter ego" of the county judge. That is, the total functioning capacity of the roads department might be equated with the county judge strictly viewed as county judge, since the judge's policies and goals can only be viewed and evaluated by the residents of the county as they are actually carried out. However, even if the entire department is so viewed as a second self in this limited sense, again, the view supports only the notion of accountability, and not the confidentiality that would be needed to fall outside Branti-Elrod
 
 
 [7]
 Judge Bowman in his dissent argues that we have today, contrary to Elrod and Branti, announced a rule that locks in low-level government workers appointed on the basis of party affiliation. The short answer to this argument is that if political affiliation is not an appropriate requirement for effective conduct of a public office, be it low-level or high-level, then Elrod and Branti, which we are bound to follow, dictate this result. The view that voters assume that all employees serve as the "alter ego" of elected supervisors could be asserted in almost any situation. To allow the presence or absence of such views to become dispositive factual findings would reduce a matter of constitutional law to a most subjective level, and would insulate such general findings by the "clearly erroneous" standard in a situation where the standard is not appropriate
 
 
 [8]
 For example, James Tibbitts, one of the dismissed county employees not a party to this action, testified for the plaintiffs that the following conversation took place:
 I went to Mr. Taylor's house, J.D. Freeman and myself, about the middle of December of '82. And I said, "Mr. Taylor," I said, "Duford," I said, "we've come to find out if we have a job or not." And I said, "We don't want any beating around the bush. We want to know 'yes' or 'no.' " He said, "Well, no." He said, "You know how politics is." And I said, "Yeah, I know how politics is." And he said, "I haven't got anything against you personally, or your work, but," he said, "I have other obligations."
 
 
 [9]
 For example, Judge Taylor testified that the road-graders
 had worked so long--they could do the work, but they had worked so long that they thought they owned the county. It was my final decision. They would not do the work properly. They ran over culverts. They ruined the culverts. They flatbladed the roads all the time down to bedrock. They were causing confusion among the employees. This was my finding as the reason the people was never called back.
 
 
 [10]
 Of course, a balancing is implicit in the rule of Elrod-Branti; in fact, Justice Brennan in his opinion for the plurality in Elrod framed the issue in balancing terms:
 [I]f conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.
 427 U.S. at 363, 96 S.Ct. at 2685 (footnote omitted). We believe, however, that the Fifth Circuit erred in equating the limited balancing of Elrod-Branti, a balancing really already achieved by the very formulation of the rule, with the much broader case-by-case balancing of Pickering-Connick. As the Jones court points out:
 In the raw patronage situation both the individual and governmental interests are essentially fixed and unvarying in content. Balancing those interests from case to case does not require open-ended inquiry concerned with specific work-place relationships that may underlie overt expressive conduct. Where the protected activity involves overt "expression of ideas," the more open-ended inquiry prescribed by Pickering and its progeny are required to accomplish the necessary balancing.
 727 F.2d at 1335 n. 6.
 
 
 [11]
 This consideration could include, for example, ineffective or inefficient work (such as knocking down mailboxes, damaging culverts, and improperly grading roads or refusing to grade certain sections of them)