**Thomas E. BAUER, Appellant,**

v.

**Freeman BOSLEY, Jr., and Paula Carter, Appellees.**

**Thomas E. BAUER, Appellee,**

v.

**Freeman BOSLEY, Jr., and Paula Carter, Appellants.**

**Nos. 85–2186, 85–2187.**

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1986.

Decided Oct. 8, 1986.

Rehearing and Rehearing En Banc Denied Dec. 30, 1986.

Robert Presson, Asst. Atty. Gen., Jefferson City, Mo., for appellant.

Mark G. Arnold, St. Louis, Mo., for appellees.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and FAGG, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Thomas E. Bauer, former Staff Legal Assistant in the Office of the Clerk of the Circuit Court of the City of St. Louis, brought this action under 42 U.S.C. § 1983 alleging that the defendants, Freeman Bosley, Jr. and Paula Carter, terminated his employment for political reasons in violation of his First, Fifth, and Fourteenth Amendment rights. Bauer asserted that Bosley, the present Circuit Clerk, and Carter, his Chief Deputy, conspired to terminate Bauer for Bauer's support of the previous Circuit Clerk, whom Bosley defeated in the Democratic primary election. The jury returned a verdict of actual damages against Bosley and Carter, and punitive damages against Bosley. The district court found that the defendants were entitled to qualified immunity, and granted their motion for judgment notwithstanding

the verdict as to the jury's award of actual and punitive damages. The court, however, ordered that Bauer be reinstated to his position. Bauer argues on appeal that the defendants were not entitled to qualified immunity and therefore the damage awards against the defendants should be reinstated. Bosley and Carter argue on their cross appeal that the court erred in restoring Bauer to his former position because the evidence was insufficient to establish that his dismissal was politically motivated, and the position itself is one for which a politically motivated dismissal would have been appropriate. We affirm the district court's grant of judgment notwithstanding the verdict as to the damage award, but reverse the court's order that Bauer be reinstated to his former position.

## I. BACKGROUND

Thomas Bauer was appointed to the position of Staff Legal Assistant II (SLA II) on January 4, 1982 by then Circuit Clerk Joseph Roddy. In the City of St. Louis the Circuit Clerk's Office is an elected position. Bauer supported Roddy in the Democratic primary election in August 1982, which Roddy lost to Bosley. Bosley then won the general election in November 1982, and took office on January 1, 1983. On January 3, Bauer met with Bosley to discuss his job. Bosley asked Bauer whether he perceived any problems in the Clerk's Office, and requested that Bauer submit to Bosley a resume of his background.

Later on the afternoon of January 3, Bauer and Bosley attended a meeting of the general term of the St. Louis Circuit Court, at which all the judges meet to set court policy. Bauer testified that he met with Bosley before the meeting to explain to Bosley what his duties were at that meeting. When the judges went into executive session, Bauer waited outside to get the notes of that session to give to Bosley. Bauer proceeded with notes in hand to Bosley's office, where two reporters were waiting. Before Bauer could give Bosley the executive session notes, the reporters began to question Bosley as to how he intended to respond to a purported order issued by the judges in the executive session. Bosley then asked Bauer to accompany him to his office to discuss the court's action. Once inside his office, Bosley asked Bauer, "You're my lawyer, give me advice. What should I tell them on this matter?" Bauer testified that he responded: "I'm sorry, Mr. Bosley, but I don't think that we can have an attorney-client relationship and I'm not your lawyer as regards any kind of a controversy you have between yourself and the court. And I couldn't be your lawyer as to a controversy between yourself and the court because I would be serving two masters, because I work both for the court and for the clerk * * * * I can't give you advice on this matter." When pressed by Bosley as to what he should do, Bauer told Bosley that an order had been issued by the circuit court and that "he had to obey it."

The "order" to which Bauer referred concerned a vote taken by the en banc court to prohibit Bosley from discharging any employees until the circuit court could file a declaratory judgment action with the Missouri Supreme Court to clarify Bosley's hiring and firing powers. Although the vote was taken on January 3, the court did not issue a formal order on that prohibition until January 6; later, the court withdrew the order. On reading the session minutes Bosley disagreed with Bauer that an order had actually been entered. Bosley testified that as a result of the incidents of January 3, his confidence and trust in Bauer and Bauer's loyalty to him were so shaken that he decided it would be in the best interest of the Clerk's Office to hire another attorney. After discussing the matter with six other attorneys, Bosley decided to terminate Bauer. Bosley gave the termination letter to Paula Carter to deliver to Bauer on January 4. Bauer testified that on handing him the letter Carter said to him, "I've been waiting a long time to give you this"; Carter testified, however, that she

made no such statement and had not known the contents of the sealed letter.[1]

Much testimony was offered at trial concerning the nature of the SLA II position, from which Bauer was discharged. Bosley testified that the SLA II was basically "the clerk's lawyer," appointed by the Circuit Clerk and paid through his personnel budget, whose duties include advising the Clerk on office policies and procedures, political matters, and personnel questions, and representing the Clerk in contract negotiations, meetings with the judges, judicial proceedings, and judicial finance hearings. Bosley characterized the relationship between the SLA II and the Clerk as one between an attorney and his client. Likewise, Julian Bush, who occupied the SLA II position from 1977 to 1981 under former clerk Roddy, testified that he was appointed by and had an attorney-client relationship with the Clerk, who directed him in his duties. Bush stated that in any dispute between the circuit court judges and the Circuit Clerk over their respective powers, he would take the Clerk's side, as he did not work for the judges but for the Clerk. Bush added that it was his responsibility "to advise the clerk with respect to his legal obligations and his legal rights."

Bauer's replacement in the SLA II position, Jimmie Edwards, testified at trial that he was appointed by Bosley to that office, and reported to and was under the direction of Bosley. Edwards stated that an attorney-client relationship existed between him and Bosley, and that he represented Bosley in cases before the state supreme court administrative judicial panel and in prisoner cases in federal district court. Further, Edwards testified that he developed personnel policy, and negotiated contracts on behalf of the Circuit Clerk. Clyde Cahill, Jr., who took over the SLA II position in November 1984, testified that he was hired by the Circuit Clerk and that any work he performed with the circuit judges was on behalf of the Clerk. Cahill stated, as did Edwards, that he worked 100 percent for Bosley, and that an attorney-client relationship existed between them. Cahill testified that among his responsibilities were advising Bosley as to personnel matters and Bosley's official duties as Clerk, and representing Bosley in administrative proceedings and in court. Additionally, Thomas Connelly, who was once a candidate for the Circuit Clerk's Office, testified that he understood the SLA II position to be the appointment of the Circuit Clerk and that an attorney-client relationship existed between them.

Bauer stated at trial that the Circuit Clerk had no authority to hire him without the approval of the presiding circuit judge, and that therefore he was given the job by then presiding Judge Corcoran, and Mr. Roddy. Bauer testified that among his duties as SLA II were advising the Circuit Clerk on complying with statutes governing office procedures, as well as on personnel matters.

Bauer filed this action in December 1983 seeking declaratory and injunctive relief as well as actual and punitive damages against Bosley and Carter. Bauer alleged that Bosley and Carter conspired with one another to violate the dictates of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) by terminating him from a nonpolicy-making, nonconfidential position because of his support for Bosley's political opponent, Joseph Roddy. The jury awarded Bauer actual damages of $58,000.00 against both Bosley and Carter, and punitive damages of $6,000.00 against Bosley. Bosley and Carter filed both a motion for new trial and a motion for judgment notwithstanding the verdict, while Bauer moved the court for the equitable relief of either reinstatement or front pay. In its memorandum and order entered August 28, 1985 the district court granted in part the defendants' motion for judgment notwithstanding the ver-

---

**1.** Other testimony at trial indicated that Bosley had decided to replace Bauer as of December 28, 1982, and that he had written Judge Gaertner of the circuit court for waiver of a policy requiring Bauer's position to remain vacant after his termination until his accrued annual leave had been exhausted.

dict, finding that they were entitled to qualified immunity from personal liability for damages under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3018–19, 82 L.Ed.2d 139 (1984). The district court also entered an award of declaratory and injunctive relief in favor of plaintiff Bauer, based on the jury's finding that the defendants violated Bauer's First Amendment rights. The court entered judgment declaring that Bauer's rights under the Constitution had been violated by defendants and ordered that Bauer be reinstated to his position as SLA II.

Bauer filed this appeal from the district court's order, asserting that the court erred in granting the defendants qualified immunity. Bauer argues first that qualified immunity is an affirmative defense, which the defendants failed to plead and thereby waived; and second, that he made a submissible case that the defendants had actual knowledge that their conduct violated Bauer's First Amendment rights, thus rendering the qualified immunity defense unavailable to them. Bosley and Carter filed a cross appeal with this court, contending that the district court erred in reinstating Bauer to his prior position because the evidence was insufficient to establish that his dismissal was politically motivated, and because the position itself is one for which a politically motivated dismissal would have been appropriate. We agree with Bosley and Carter that the SLA II position is one for which a politically or personally motivated dismissal would have been appropriate, and therefore reverse the district court's reinstatement of Bauer on that basis.

## II. DISCUSSION

The right that Bauer asserts in this case, the freedom enjoyed by a public employee from dismissal for political reasons, was first articulated by the Supreme Court in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality), which concerned the dismissal of deputy sheriffs. In its opinion, the plurality traced the history of the practice of political patronage, and emphasized the pressure that practice exerts on a public employee's freedoms of belief and association. The plurality held that the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments, but carved an exception for policymaking positions to ensure that "representative government not be undercut by tactics obstructing the implementation of policies of [a] new administration * * * * Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end." 427 U.S. at 367, 96 S.Ct. at 2687. Noting that "no clear line can be drawn between policymaking and nonpolicymaking positions," the plurality opinion stressed that the nature of an employee's responsibilities is the critical factor in categorizing that employee. *Id.* The plurality stated that an employee with responsibilities that are not well defined or are of broad scope, or one who acts as an adviser or formulates plans for implementing broad goals is more likely to function as a policymaker. *Id.* at 367–68, 96 S.Ct. at 2686-87. In his concurring opinion, Justice Stewart framed the plurality's holding as prohibiting the discharge or threat of discharge of a "nonpolicymaking, nonconfidential government employee * * from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.* at 375, 96 S.Ct. at 2690.

Four years after the *Elrod* decision, the Supreme Court clarified the exception to the prohibition of patronage dismissals in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In *Branti,* the Court held that the dismissal of two assistant public defenders was not permissible under the First and Fourteenth Amendments, because any policymaking occurring in the public defender's office would be tied to the representation of individual clients, and not to partisan political interests. Likewise, although an assistant public defender would obtain access to confidential information in the course of his representation of various clients, that information would not relate to partisan political

concerns either. The Court stated that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." [2] 445 U.S. at 518, 100 S.Ct. at 1295.

In the instant case the district court submitted to the jury the question whether the SLA II position fit the exception to the prohibition against patronage dismissals.[3] By returning its verdict for plaintiff Bauer, the jury necessarily found that political affiliation was not an appropriate requirement for the SLA II position. We believe, however, that on the facts before us the SLA II position is excepted from the rule of *Elrod-Branti* as a matter of law. We note at the outset that not only do the parties dispute whether the appropriateness of political affiliation to a particular position is a question of law or fact, but courts themselves have disagreed whether the determination is one of law or fact. *See Horton v. Taylor*, 767 F.2d 471, 478 (8th Cir.1985) and cases cited therein. Even within this circuit a difference of opinion exists as to the nature of the question. *Compare Horton, id. and Hartley v. Fine*, 780 F.2d 1383, 1385, 1388 (8th Cir.1985) (in jury trial, district court determined that plaintiff employee's position was nonpolicymaking) *with Barnes v. Bosley*, 745 F.2d 501, 508–09 (8th Cir.1984), *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985)

(in bench trial, district court's finding that political affiliation was not an appropriate requirement for plaintiffs' positions was not clearly erroneous) *and Gibbons v. Bond*, 668 F.2d 967, 968–69 (8th Cir.1982) (same). We think that just as the nonpolicymaking, nonconfidential nature of the plaintiff road-graders' jobs was clear from the record in *Horton*, 767 F.2d at 478, so is the confidential nature of the SLA II position evident from the record before us. Thus the district court, on the facts of this case, erred in submitting to the jury the question of the appropriateness of party affiliation as a ground for dismissal.

We base our holding in large part on the testimony adduced at trial from Bauer's predecessor and successors in the SLA II position. Uniformly, Bauer's predecessor, Julian Bush, and Bauer's successors, Jimmie Edwards and Clyde Cahill, Jr., testified that while they served in the SLA II office they shared an attorney-client relationship with the Circuit Clerk. Similarly, both Bosley and Thomas Connelly, a former candidate for Circuit Clerk, stated that the relationship between the SLA II and the Clerk was properly that of attorney-client. This same group of witnesses, Bush, Edwards, Cahill, Bosley, and Connelly, testified that the SLA II was appointed by the Circuit Clerk only, in contrast to Bauer's testimony that both Judge Corcoran and Clerk Roddy gave him his job. Bush and Cahill both stated that while serving in the SLA II position they were responsible for advising the Circuit Clerk as to his official duties.

---

**2.** Although both *Elrod* and *Branti* dealt with terminated employees whose political party differed from that of the hiring authority who terminated them, subsequent court of appeals decisions have held that the prohibition of patronage dismissals voiced in *Elrod* and *Branti* applies as well when the discharged employee and the hiring authority are from two different factions of the same party. *See, e.g., Barnes v. Bosley*, 745 F.2d 501, 506 n. 2 (8th Cir.1984), *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985); *McBee v. Jim Hogg Co.*, 703 F.2d 834, 838 n. 1 (5th Cir.1983). Thus *Elrod* and *Branti* control this case even though Bauer and Bosley are from two separate factions of the Democratic Party in St. Louis.

**3.** Specifically, the jury instructions on the issue of the appropriateness of political affiliation to Bauer's position were as follows:

*Instruction No. 14:* In determining whether political affiliation is an appropriate requirement for a position, you are to consider: the employee's responsibilities and authority, primary duties, level of position, and capacity to formulate policymaking for confidential relationship or [sic] whether the position has a direct or indirect, meaningful input into decision making for the employer.

*Instruction No. 15:* If you believe that political affiliation is an appropriate requirement for the position of Legal Advisor or Legal Staff Assistant II, then your verdict must be for the defendants.

Even Bauer admitted that he advised the Clerk as to compliance with statutes governing office procedures, and explained to Bosley his role as Clerk at the circuit judges en banc meeting. Evidence at trial also indicated that Bauer made recommendations to the Clerk on personnel matters; Edwards and Cahill testified that they too advised the Circuit Clerk on personnel questions when each of them served as SLA II. Edwards and Cahill further stated that while occupying the SLA II office they represented the Circuit Clerk in various matters, including contract negotiations, and judicial and administrative proceedings.

Based on the record testimony, then, it seems clear to us that the SLA II position is exactly the sort of position for which political affiliation is an appropriate requirement for effective performance. The SLA II is the only position in the Circuit Clerk's Office that must be filled by an attorney licensed by the State of Missouri. Because the responsibilities of the SLA II encompass the rendering of legal advice to, and legal representation of the Circuit Clerk, the Clerk is entitled to appoint to the position an attorney in whom he can repose his trust and confidence. To require a newly elected Circuit Clerk to retain his predecessor's appointee to the SLA II position would be to ignore the aspects of confidentiality and loyalty attendant to the attorney-client relationship. Unlike the assistant public defender positions at issue in *Branti*, the attorney-client relationship that the SLA II enters here is not with outside clients, but with the Circuit Clerk himself, who is elected to his position and entitled to execute his policies within the strictures of his office. As such, should the Circuit Clerk and the SLA II be at odds politically or personally, it can easily be contemplated that the efficient running of the Clerk's Office would be adversely affected. An attorney should not force his services upon any client or individual in any situation that encompasses an attorney-client relationship or a relationship that commands mutual confidence, fidelity, and compatibility.

The arguments advanced by Bauer as to why political affiliation is not an appropriate requirement for the SLA II position do not change our conclusion. Bauer states that the Missouri legislature provided for the possibility that the Circuit Clerk of the City of St. Louis might need counsel by providing in Mo.Rev.Stat. § 483.260 (1978) that the St. Louis Circuit Clerk "may employ an attorney or attorneys to aid and advise him in the discharge of his duties, to render independent legal advice and services and to represent him in court." This statute, however, limits the compensation that may be paid to such independent counsel to $5,000 a year. This low figure, which would buy no more than two weeks of representation in the current legal market, indicates that this provision is to cover any special needs that might arise in the Circuit Clerk's Office, such as litigation, and not the day to day matters handled by the SLA II. Bauer also argues that Mo. Rev.Stat. § 476.290 (1978) negates the possibility that the SLA II shares an attorney-client relationship with the Circuit Clerk. Section 476.290 provides in pertinent part:

> [N]or shall any clerk or deputy clerk, while he continues to act as such, plead, practice or act as counselor or attorney in any court within the county for which he is such clerk or deputy clerk, in his own name or in the name of any other person, under any pretense whatever.

Assuming *arguendo* that the SLA II is a deputy clerk, we do not think this statute requires that the SLA II refrain from acting as an attorney or giving legal advice; at most the statute precludes the SLA II from practicing or appearing *in* court in the City of St. Louis.

Bauer next asserts that the job description of the SLA II position does not support the defendants' claim that an attorney-client relationship existed between the SLA II and the Circuit Clerk, because that document details several duties that the SLA II is to perform for and under the supervision of the judges of the circuit court. The testimony at trial indicated, however, that the job description in question contained

only general guidelines for all SLA II positions, or lawyers working for the court, in the entire state judiciary. The document on its face states that "Any one position may not include all of the duties listed, nor do the examples cover all the duties which may be performed." Thus the "Examples of Work Performed" listed on the job description are neither dispositive nor especially pertinent to the issue of the appropriateness of political affiliation to the SLA II position.

As for Bauer's further contention that no attorney-client relationship existed in fact between Bauer and Bosley, this argument fails to comprehend that the proper focus is on the "powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). In *Tomczak* the Seventh Circuit went on to state: "Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance." *Tomczak*, 765 F.2d at 641. *See also Mummau v. Ranck*, 687 F.2d 9, 10 (3d Cir.1982); *Ness v. Marshall*, 660 F.2d 517, 521–22 (3d Cir.1981). It is clear from the testimony of Bush, Edwards, and Cahill that functions creating an attorney-client relationship—rendering legal advice, advising as to legal policy, and providing legal representation at administrative hearings—normally attend the SLA II position. Thus the SLA II position is exempt from the prohibition against political terminations, regardless of whether Bauer himself performed such functions or entered such a relationship with Bosley. Further, that Bauer, or any other SLA II in the Office of the Circuit Clerk in the City of St. Louis, might have performed some

work for the circuit court judges in addition to his duties to the Circuit Clerk does not warrant a change in our conclusion that political affiliation is an appropriate requirement for the effective performance of the position.[4] *See Ness*, 660 F.2d at 522.

Finally, Bauer asserts that Bosley "testified without qualification that he did not consider political affiliation to be an appropriate requirement" for the SLA II position, and therefore cannot now challenge a court order that accepts that testimony as true. The testimony given by Bosley to which Bauer cites[5] reads as follows:

Q. [Plaintiff's counsel]: Do you consider, Mr. Bosley, that political affiliation is an appropriate requirement for the position of legal staff assistant II in the clerk's office?

A. [Bosley]: Do I consider political affiliation?

Q. Yes.

A. No.

Bosley later testified on direct that he thought he was being asked whether he considered political affiliation in filling jobs, not whether he considered political affiliation an appropriate requirement for the SLA II position in his office. Bosley then testified that he did consider political affiliation an appropriate requirement for the position of legal advisor. That Bosley testified, in effect, that he did not consider political affiliation in filling the SLA II position but that political affiliation would be an appropriate requirement for the position is not inconsistent. The inquiry here is not whether political affiliation is a *necessary* requirement for the effective performance of the SLA II position, but whether it is an *appropriate* requirement. *See Ness*, 660 F.2d at 522. And under the facts of this case, we hold that political affiliation is an appropriate requirement for the effective performance of the SLA II position.

**4.** Clyde Cahill, Jr. testified that any interaction he had with the circuit judges was on behalf of Bosley. Both Cahill and Edwards stated that they worked 100% for the Circuit Clerk.

**5.** Bosley's testimony cited by Bauer was read into the record from a pretrial deposition taken of Bosley by Bauer's counsel.

Because of our conclusion as to the appropriateness of political affiliation as a grounds for dismissal from the SLA II position, we need not address whether Bauer's discharge was in fact politically motivated, or the issue of qualified immunity.

## III. CONCLUSION

The district court's grant of judgment notwithstanding the verdict as to the damage award is affirmed, while the order declaring that Bauer's Constitutional rights had been violated and reinstating Bauer to his former position is reversed.

HEANEY, Circuit Judge, dissenting.

The jury in this case decided that a motivating factor in Thomas Bauer's dismissal was the political work that Bauer performed in the campaign of Circuit Clerk Freeman Bosley's opponent, Joseph Roddy.

The majority decides that, in spite of this finding, Bosley's dismissal of Bauer is not prohibited by the Supreme Court's decisions in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). I disagree.

The presence of an attorney-client relationship does not automatically qualify the SLA II position as a policymaking or confidential one under *Elrod* and *Branti. Branti* itself involved an attorney-client relationship. There, two assistant public defenders were discharged by their superior for political reasons. 445 U.S. at 509, 100 S.Ct. at 1290. The discharged assistant public defenders had access to confidential information, but the Court held that that information had no bearing on partisan political concerns, and thus they remained under the protection of the first amendment. *Id.* at 519–20, 100 S.Ct. at 1295–96.

Similarly, in this case, partisan concerns have little to do with the proper performance of the SLA II's duties. The majority attaches great importance to the "confidentiality and loyalty" attendant to the attorney-client relationship between the SLA II and the Clerk. *See supra* p. 1063. But, as *Branti* has established, the requirement for loyalty in a position is not in itself sufficient to permit patronage firings. There must be a legitimate requirement for *political* loyalty.[1] Does the position of SLA II appropriately and inherently require a politically loyal person?

One clearly cannot answer in the affirmative after examining the SLA II job description promulgated under the authority of the Missouri Supreme Court.[2] The

---

1. In *Meeks v. Grimes*, 779 F.2d 417, 421 (7th Cir.1985), a case involving bailiffs with access to confidential information, the Court stated the following about requirements for political loyalty:

   Defendants stress that any access to court records when coupled with political animosity creates a serious threat of politically motivated breaches of confidentiality of the judicial process. This argument, while relevant, proves too much. These bailiffs are duty-bound to protect the sanctity of the court, and, *while political affiliation may be an acceptable priority for loyalty, trust, and maybe even efficiency, it would cast the net of the* Elrod *exception too wide to allow political support to be used to extrapolate a tendency to breach a sworn duty, behave unprofessionally, or commit criminal acts.* [Emphasis supplied.]

2. DEFINITION OF WORK
   This is complex and varied professional legal work in providing legal services and tech-

nical support to judges, commissioners, circuit clerks or other administrators.

   Work involves the performance of a variety of legal, technical and lead person duties in facilitating the smooth operation of a large circuit court or division thereof. Work differs from the Legal Staff Assistant I in that incumbents are able to address the more complex legal issues and are required to operate independently with a minimum of supervision. In addition, employees in this class may be required to act as a lead person over subordinate legal staff or other court clerical personnel as a duty which is incidental to the primary task of providing legal services. Work is performed under the general supervision of a judge, commissioner, circuit clerk or administrator and is reviewed through conferences and written reports.
   EXAMPLES OF WORK PERFORMED (Any one position may not include all of the duties listed, nor do the examples cover all the duties which may be performed.)

duties described there are simply technical and legal.

In the "Definition of Work," it is stated that the SLA II provides "legal services and *technical support to judges, commissioners, circuit clerks or other administrators.*" (Emphasis supplied.) The description goes on to state that "[w]ork differs from the Legal Staff Assistant I in that incumbents are able to address the more complex legal issues and are required *to operate independently with a minimum of supervision.*" (Emphasis supplied.) Nowhere does the job description even suggest that the SLA II should act as the clerk's "personal attorney" or political advisor.

In the portion of the job description entitled "Examples of Work Performed," a number of duties of the SLA II are mentioned. These duties include: supervising subordinate legal staff; training personnel; reviewing and analyzing court decisions; processing suits; reading digests and excerpting pertinent points of law; preparing briefs and memoranda for judges; preparing legal orders; reviewing petitions and making recommendations thereon to judges; auditing and approving inheritance tax reports and inventories of assets; conferring with judges concerning legal matters; conferring with attorneys about matters before the court; and performing related work as required. Nowhere in the examples mentioned does SLA II appear to assume a role as the clerk's speech writer, personal aid, or personal attorney. Instead, the examples listed are of a technical and administrative nature with the services intended to be provided to judges and clerk of court personnel alike.

Undoubtedly, in performing these duties, the SLA II must be loyal to the judges, commissioners, circuit clerks, or other administrators for whom he or she works.

Acts as a lead person over subordinate legal staff or other clerical or paralegal personnel as required; trains personnel as necessary.

Reviews, analyzes, studies, searches and annotates laws, court decisions, documents, opinions, briefs and related legal authorities to process suits, trials, hearings, appeals and other litigated matters; may appear at court hearings.

Reads and digests opinions, brief, motions and documents and extracts excerpts pertinent to points of law and fact.

Prepares briefs, legal memoranda and statement of issues involved, including appropriate written or oral suggestions or recommendations to the judge; prepares appropriate orders, findings of fact and conclusions of law for judge.

Compiles references on laws and decisions necessary for legal determinations.

Prepares complex service orders such as immediate restraining orders, show cause and temporary injunction; reviews and prepares forms and manuals.

Reads petitions, checks for accuracy, checks facts, allegations and legality; approves the more routine petitions; sends more complex petitions with recommendations to judge for review and approval; interviews guardian and ward relative to estate matters.

Audits and approves inheritance tax reports and inventories of assets: checks assets, deductions and property distributions; determines adequacy of surety bonds.

Confers with judge concerning legal questions, construction of documents and the granting of orders; may grant or deny continuances in routine matters.

Confers with attorney concerning the adequacy of petitions or other matters before the court; provides general information to the public.

Performs related work as required.

DESIRABLE EDUCATION AND EXPERIENCE

Graduation from an accredited law school and experience in the practice of law; or any equivalent combination of education and experience which provides the following knowledge, abilities and skills:

Considerable knowledge of one or more phases of law as required by the assigned duties.

Considerable knowledge of general law, State laws, established precedent and sources of legal reference.

Considerable knowledge of court procedures and rules of evidence.

Ability to apply legal principles and specialized knowledge to individual cases and problems.

Ability to analyze, appraise and organize facts, evidence, and precedents concerned in assigned cases and to prepare written opinions.

Ability to train and supervise subordinates if required by the position.

Ability to establish and maintain effective working relationships with others.

NECESSARY SPECIAL REQUIREMENTS

Possession of a Certificate of Admission to the Bar of the State of Missouri.

But this loyalty could not properly be political because many of these persons may properly be of different political persuasions from each other.

The testimony of witnesses provides no more conclusive evidence of the necessity of the political loyalty of the SLA II to the clerk. That Bosley and a group of other witnesses—Julian Bush, Bauer's predecessor, and Jimmie Edwards and Clyde Cahill, Jr., Bauer's successors—variously testified that the Circuit Clerk appointed the SLA II, that the SLA II was responsible for advising the Clerk as to his or her official duties, and that the SLA II advised the clerk on personnel questions does not convert the SLA II position into one requiring political loyalty. These tasks appear to be very similar to the ones described in the job description, which were supposed to be available to other court personnel, such as judges.

The legal representation which the SLA II provided the clerk also seems apolitical: Bosley's one-time SLA II Jimmie Edwards' drafting of a IBM computer contract, defending the clerk in prisoners' suits, and making appearances before administrative tribunals. The representation in these cases seems to be of the Clerk of Court office in general, not just Freeman Bosley personally. Edwards conceded as much when he stated, "I also protected approximately 210 employees whenever they encountered any legal challenges from attorneys or the general public."

Finally, and most convincingly, both Bosley and Edwards, directly admitted to the apolitical nature of the SLA II job. Bosley stated that he did not consider political affiliation in hiring his SLA IIs. Bosley only attempted later in his testimony to retract this statement by stating that he himself did not consider political affiliation in hiring and firing but that another clerk might properly do so. Edwards, however, testified that it would *never* be appropriate to consider the political allegiances of the SLA II in determining competency for the position:

Q. Hypothetically, if a person was a legal advisor and he was in a different political party than the clerk, could he harm or hamper the clerk?
A. I don't think that that really has anything to do with it. My job was to handle the legal questions and the legal questions are very, very clear, the interpretation of the laws of the State of Missouri. I don't think that politics has anything to do with it.

\* \* \* \* \* \*

Q. If I understand your earlier testimony correctly, you think that particular party affiliation really doesn't matter to the appointment process to the legal advisor. That he is getting somebody who is competent to do the job. Is that right?
A. Definitely true.

Not only do Bosley's and Edwards' testimony indicate that the appropriate requirements for the SLA II position are nonpartisan in nature, the majority fails to point to any testimony or documentary evidence, other than Bosley's modification of his statement, suggesting directly that partisan allegiance constitutes an appropriate requirement for the job of SLA II.

Thus, from the testimony of mostly partial witnesses, without any support from Missouri statutory law or administrative rules, the majority constructs an *Elrod-Branti* confidential relationship between the SLA II and the Clerk of Court. In doing so, however, the majority ignores the central distinction in *Elrod* and *Branti* between mere loyalty and political loyalty. The evidence in this case only shows that the SLA II position legitimately requires a loyal person; it falls far short of showing that the position requires a politically loyal person.

The outcome which I believe is correct under *Elrod* and *Branti* may seem unfair to Bosley in that he would be the first Circuit Clerk affected by *Elrod* and *Branti*, particularly because Bauer himself certainly exercised powers not inherent in the office of SLA II when he actively campaigned for the reelection of Circuit Clerk Roddy. The Supreme Court, however, did

not exempt employees previously hired for patronage reasons from its general rule. The Supreme Court's ruling in *Elrod* protected from the time it was decided all employees in positions for which political affiliation is not an appropriate job requirement. Bauer held such a position after *Elrod* and *Branti* had been decided and thus cannot be excepted from its rule.

### QUALIFIED IMMUNITY

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738 (citations omitted). This defense of qualified immunity is an affirmative one which therefore must be pleaded.[3] *Id.* at 815, 102 S.Ct. at 2736. *Creamer v. Porter,* 754 F.2d 1311, 1317 (5th Cir.1985) (citations omitted).

*Elrod* and *Branti* had been decided before Bosley dismissed Bauer in January of 1984. These decisions certainly established the constitutional right that government employees could not be terminated for patronage reasons from positions for which political affiliation was not an appropriate requirement. Bosley contends that the general establishment of the right is not sufficient but that it must be clearly established to be a right the plaintiff Bauer held. Bosley submits that it was not clearly established that Bauer did not fit within the *Elrod-Branti* exception.

There will always be some uncertainty whether it is clearly established that a particular individual possesses a given constitutional right. As the Supreme Court recently stated in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1986), regarding the prohibition of wire-

taps without a warrant and whether such law was clearly established:

> We do not intend to suggest that an official is always immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances. But in cases where there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law.

*Id.* 105 S.Ct. at 2820 n. 12.

In *Mitchell,* 472 U.S. ——, 105 S.Ct. 2816–20, the general constitutional prohibition against wiretaps without probable cause had not been clearly established by the Supreme Court before the action in question took place. Here, *Elrod* and *Branti* had both been decided before Bosley dismissed Bauer.

Clearly some question still remained after *Elrod* and *Branti* as to who was to be excepted from the general rule. But as the *Mitchell* case clarifies, some question is not sufficient. In every valid suit for violation of constitutional rights there will remain some question as to the legitimacy of the claim. *Harlow* certainly was not intended to discourage such valid suits, which it would effectively do if interpreted this way, by immunizing public officials from liability in them.

*Harlow* especially should not be interpreted to free public officials who deliberately fire employees before serious questions of the constitutionality of such actions can be resolved. In this case, Bosley fired Bauer in the face of a proposed order of the St. Louis Circuit Court sitting en banc prohibiting such action. Such behavior by a public official should not be protected.

I therefore believe that the jury's award of $58,000 in actual damages and $6,000 in

---

**3.** In this case there is some question whether the defendant Bosley adequately raised the defense at trial. *Compare Brown v. St. Louis Dept., et al.,* 691 F.2d 393, 396 (8th Cir.1982), and *Johnson v. Rogers,* 621 F.2d 300 (8th Cir. 1980). The issue of whether Bosley adequately

raised the defense at trial, however, does not have to be resolved. Even assuming it was adequately raised, the defendant would not be protected by the qualified immunity doctrine as stated in *Harlow.*

punitive damages to Bauer should be reinstated. The award of $6,000 in punitive damages was based on the jury's finding that Bosley believed he was violating Bauer's constitutional rights when he terminated him. Evidence was submitted that Bauer knew of the *Elrod* and *Branti* cases at the time he fired Bosley and also that Bosley knew he could not constitutionally fire Bauer for political reasons but did so in spite of such law. The jury's verdict therefore is supported by the evidence and should not be overturned.