RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0012p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MARY PATRICK LATHAM,

       *Plaintiff-Appellant,*

    *v.*

THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE
OF OHIO, et al.,

       *Defendants-Appellees.*

No. 03-3830

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00032—Susan J. Dlott, District Judge.

Argued: September 21, 2004

Decided and Filed: January 10, 2005

Before: MARTIN, COLE, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Marc D. Mezibov, MEZIBOV & JENKINS, Cincinnati, Ohio, for Appellant. Michael R. Barrett, BARRETT & WEBER, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Marc D. Mezibov, Christian A. Jenkins, MEZIBOV & JENKINS, Cincinnati, Ohio, Michael N. Budelsky, SIRKIN, PINALES, MEZIBOV & SCHWARTZ, Cincinnati, Ohio, for Appellant. Michael R. Barrett, Stephanie K. Bowman, BARRETT & WEBER, Cincinnati, Ohio, for Appellees.

---

## OPINION

---

    R. GUY COLE, JR., Circuit Judge. Plaintiff-Appellant Mary Patrick Latham appeals the district court's grant of summary judgment in favor of Defendants-Appellees Office of the Attorney General of the State of Ohio ("OAG") and others. Latham brought this action against the OAG claiming that its termination of her employment violated both her First Amendment rights and the anti-retaliation provisions of the Age Discrimination in Employment Act of 1967 ("ADEA"). The district court granted summary judgment in favor of the defendants on both claims. Because Latham's position is properly viewed as a "confidential or policymaking" position, and because plaintiffs are barred from recovering damages against a State under the ADEA, we hereby **AFFIRM** the judgment of the district court.

1

## I.

Mary Patrick Latham was hired as a consumer protection attorney in the OAG's Cincinnati office on April 13, 1987. While she reported to a section head in the OAG's main office in Columbus, she was the only consumer protection attorney in Cincinnati. As an assistant attorney general, her duties included, *inter alia*, preparing, presenting, and arguing cases; assisting settlement negotiations, and making recommendations to her superiors as to how best to protect Ohio consumers. However, she required approval from supervisors in the Columbus office before opening a case file, filing a complaint, submitting a brief, or initiating or finalizing a settlement. Latham was also not allowed to speak to the press on behalf of the OAG.

On July 17, 1995, trial was scheduled to begin in a case brought by the OAG against Allied Pest Control for enforcement of a consent judgment. Latham was assigned to conduct the trial on behalf of the OAG. In the weeks before the scheduled trial date, she was informed that Robert Hart, an assistant attorney general based in Columbus, would be handling settlement negotiations between the parties, with an eye towards avoiding a trial altogether. The day the trial was to have begun, the parties settled the case.

That night, Latham drafted a letter ("the 1995 letter") to Attorney General Betty Montgomery, outlining concerns she had with both the Allied settlement and the general direction of the Consumer Protection Section. On the following day, July 18th, she sent the letter to Montgomery, forwarding copies to Robert Hart, Randal Berning (head of the OAG's Cincinnati office), and Eric Brown (then-acting head of the Consumer Protection Section, and Latham's immediate supervisor). Latham received no reply or other response to her letter.

The next month, Brown was replaced as head of the Consumer Protection Section by Helen MacMurray. Two years later, in the fall of 1997, Latham, MacMurray, and Berning had a series of meetings, at which MacMurray raised concerns about Latham's job performance and relationship with other OAG staff members. The parties dispute the tenor of these meetings, but it is undisputed that Latham was upset at MacMurray's allegations. Following one of these meetings, Latham filed an age-based discrimination complaint with the OAG, alleging that the OAG (through Berning and MacMurray) failed to promote her and kept her from being involved in certain cases because of her age. Finally, after a contentious meeting regarding a complaint about Latham made by another OAG staff member, Attorney General Mongomery terminated Latham's employment on January 2, 1998.

Latham brought suit in federal court, alleging, after two amendments to her complaint, that her discharge was both a violation of the ADEA and of her First Amendment rights under 42 U.S.C. § 1983. The district court granted summary judgment on the ADEA claim on Eleventh Amendment grounds, and then, upon the release of our decision in *Rose v. Stephens*, 291 F.3d 917 (6th Cir. 2002), several weeks before the scheduled trial of the instant case, granted summary judgment on the First Amendment claim. This appeal followed.

## II.

### A. Standard of Review

As always, this Court reviews grants of summary judgment *de novo*. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

**B. Section 1983 First Amendment Retaliation Claim**

Latham asserts that she was fired, at least in part, because of the 1995 letter she wrote to then-Attorney General Montgomery. Such a dismissal, she argues, violated her free speech rights under the First Amendment and 42 U.S.C. § 1983. The OAG asserts that Latham was terminated because she was disruptive in the office and could no longer be trusted to represent the OAG responsibly. However, since this appeal is from a grant of summary judgment in the OAG's favor, we must view all facts in the light most favorable to Latham. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). As a result, we must determine if Latham's termination would result in a viable claim under 42 U.S.C. § 1983 if, in fact, she had been terminated in retaliation for the views she expressed in the 1995 letter.

It is well-settled law that public employees are not obligated to abandon all their constitutional rights as a requirement for either obtaining or retaining their employment. *See, e.g., Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) ("The theory that public employment . . . may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605–06 (1967)). Therefore, in order to determine whether a public employer has violated the First Amendment by firing an employee for engaging in speech, courts must balance the interests of the government – as both sovereign and employer – and those of the employee as citizen. *Pickering*, 391 U.S. at 568. To do so, we first determine whether an employee's speech addresses a matter of public concern, and, if so, then balance the interests of the employer in providing effective and efficient services against the employee's First Amendment right to freedom of expression. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995).

*1. Was the Subject of Latham's Speech a Matter of Public Concern?*

An expression addresses a matter of public concern where its subject matter is such that the public at large would have an important interest in the issue. *Pickering*, 391 U.S. at 571. Latham's 1995 letter dealt with both her concerns about the settlement of a case and her general concerns regarding the OAG's enforcement of Ohio's consumer protection laws. It is indisputable that the enforcement decisions of the OAG in consumer protection cases, in both particular cases and generally, are a matter of public concern, and, indeed, the OAG has not disputed this issue on appeal. We thus turn to the balancing step of the *Pickering* analysis.

*2. Does Rose v. Stephens Apply To Latham's Case?*

In *Rose v. Stephens*, 291 F.3d 917 (6th Cir. 2002), we held that, as a matter of law, the second step of the *Pickering* test favors the governmental employer "where a confidential or policymaking public employee is discharged on the basis of speech related to his political or policy views . . . ." *Id.* at 921. *Rose* involved a § 1983 action by the Kentucky state police commissioner alleging that he was terminated in violation of his right to freedom of expression under the First Amendment when his termination was based on his refusal to withdraw a memorandum to the governor outlining Rose's reasons for eliminating the deputy police commissioner position. Considering that the Supreme Court had already allowed government employers to terminate confidential or policymaking employees solely on the basis of their political affiliation, *see, e.g., Elrod v. Burns*, 427 U.S. 347, 367 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980), we noted that "it would make little sense to permit the government to pre-emptively dismiss employees on the basis of political affiliation alone, while restricting its ability to respond to an overt act of disloyalty by an employee in the same position." *Rose*, 291 F.3d at 922.

Latham argues that the presumption in favor of the government that we outlined in *Rose* should not apply to her case for three reasons: (1) her speech was not made publicly; (2) her speech did not constitute insubordination or disloyalty; and, most importantly, (3) her position was not a confidential or policymaking position. We consider each argument in turn.

### a. The Public Nature of Latham's Speech

First, Latham argues the speech must be public for the presumption in favor of the government to apply, and that her speech (i.e., the 1995 letter) was not public. Therefore, she claims, the presumption from *Rose* should not apply here. In fact, however, the speech at issue in *Rose* was also never made "public." Rose only sent his memorandum to his superior (the Secretary of Kentucky's Justice Cabinet) and his superior's superior (the Governor). Here, Latham's 1995 letter was also sent to her superior (the acting head of the Consumer Protection Section) and her superior's superior (Attorney General Montgomery), as well as to several other OAG attorneys. Accordingly, Latham's letter was no less public than was the speech at issue in *Rose*. Furthermore, in *Rose*, we focused on how the speech would affect the employer's ability to maintain a working relationship with his or her employees, rather than whether the speech was "public" or intra-office. *See id.* at 923. As a result, any small distinction between the public nature of Latham's speech and that of the speech in *Rose* should not affect the application of *Rose* to this case.

### b. Insubordination

Next, Latham argues that, in contrast to Rose's actions, her speech did not constitute insubordination or disloyalty. Rose was fired after he refused to withdraw the memorandum he had submitted to the Secretary of the Justice Cabinet and to the Governor. Latham argues that it was Rose's *act of refusal* to withdraw the memorandum, not the memorandum's contents, that led to Rose's dismissal, and that Latham did not act in a similarly disloyal or insubordinate fashion. However, Latham misunderstands our holding in *Rose*. Had Rose been terminated merely for the act of refusing to withdraw the memorandum regardless of its contents, then his case never would have involved a speech-related analysis. Rather, the *Rose* panel presumably would have analyzed cases in which an employee refused to follow the job-related instructions of his employer – obviously good cause for termination. However, Rose's superior obviously wanted Rose to withdraw his memorandum because of its content stating Rose's intent to eliminate the position of deputy commissioner, a position which was then occupied by a friend of the governor. *See, e.g.*, *Rose*, 291 F.3d at 924-25. The insubordination at issue was thus Rose's *speech* on job-related matters, and as we noted in that case, "it is insubordination for an employee whose position requires loyalty to speak on job-related issues in a manner contrary to the position of his employer, and . . . employees may always be discharged for good cause, such as insubordination." *Id.* at 923.

Latham's case is, again, not significantly different. Latham speaking out on her employer's policies could have made it difficult for her employer to trust her to implement those same policies. As the Supreme Court has noted, "[w]hile as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149. While this may seem draconian at first glance, recall that, under *Elrod* and *Branti*, confidential or policymaking employees may be discharged merely for their political affiliations, without *any* on-the-job acts even hinting at disloyalty or insubordination. Viewed in that context, it would seem incongruous for us to suggest that such an employee's job-related speech would have to rise to the level of outright rebellion before termination would be valid under the First Amendment, when the same employee could be fired merely due to affiliation with an opposing political party, whether or not the employee *ever* evinces any policy disagreement with the party in power. In either case, a confidential or policymaking employee would have, under *Elrod, Branti*, and *Rose*, placed himself in a position such that his State employer might not be able to trust him to implement fully the employer's policies. As a result, assuming Latham is found to be a policymaking or confidential employee, her conduct in speaking out against the central enforcement policies of her department, while admittedly well-intended, was sufficiently insubordinate to overcome any First Amendment bar to her termination.

*c. The Policymaking/Confidential Nature of Latham's Position*

Finally, and most importantly, Latham argues that her case is not governed by *Rose*'s automatic presumption in favor of the government because she, as an assistant attorney general in the OAG, was not a "policymaking or confidential" employee. The Supreme Court has conceded that "[n]o clear line can be drawn between policymaking and nonpolicymaking positions." *Elrod*, 427 U.S. at 367. We, however, have articulated four categories of employees who will always fall within the *Elrod/Branti* policymaking or confidential employees exception:

> **Category One**: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

> **Category Two**: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

> **Category Three**: confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors; and

> **Category Four**: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*McCloud v. Testa*, 97 F.3d 1536, 1557–58 (6th Cir. 1996). In determining whether an employee falls into one of these categories, we must examine the inherent duties of the position, rather than the actual tasks undertaken by the employee. *Williams v. City of River Rouge*, 909 F.2d 151, 155 (6th Cir. 1990); *see also Faughender v. City of N. Olmstead*, 927 F.2d 909, 913 (6th Cir. 1991) (citing many cases from other circuits).[1] While the "inherent duties of the position" are not necessarily those that appear in the written job description and authorizing statute, such descriptions can be instructive. *See, e.g.*, *Williams*, 909 F.2d at 154-55. Finally, a position need not fit perfectly within one of the "generic" *McCloud* categories in order to be found by a court to be a "confidential or policymaking" job. *Feeney v. Shipley*, 164 F.3d 311, 318 (6th Cir. 1999).

Latham's position, that of assistant attorney general, is authorized under Ohio Rev. Code § 109.03, which states:

> The attorney general may appoint . . . assistant attorneys general, each of whom shall be an attorney at law, to serve for the term for which the attorney general is elected, unless sooner discharged by him, and each shall perform such duties, not otherwise provided by law, as are assigned him by the attorney general.

---

[1] Latham argues that we must consider both the actual and inherent duties of the position at issue. However, this is likely to be the case only if the employment action at issue is a hiring decision where the new supervisor's conception of the actual duties of the position at issue will deviate from what they have been in the past. *See, e.g.*, *Faughender*, 927 F.2d at 909. In addition, courts have considered the actual duties of the employee in order to determine the inherent duties of the position. *See, e.g.*, *Gordon v. County of Rockland*, 110 F.3d 886, 888 (2d Cir. 1997).

In addition, Latham's job description, contained in her personnel file, details potential duties of an assistant attorney general, including: appearing in court on behalf of the Attorney General; presenting legal opinions to the Attorney General or other state personnel; discussing law and/or policy with the Attorney General, senior attorneys, and state clients; working with state, federal, and local officials and members of the public in order to solve legal issues; and drafting and reviewing confidential, important, and routine documents under the direction of a senior attorney. The description also notes that an assistant attorney general "[m]ust be able to maintain the highest level of confidential and fiduciary relationship in counseling clients and the Attorney General."

Latham's position, as a fiduciary of the Attorney General, falls sufficiently within the bounds of Categories Two and Three from *McCloud*, as a confidential advisor to, and delegatee of, a policymaking employee (here, the Attorney General) on job-related matters. Latham argues that she did not have authority to file a case or even submit a brief on behalf of the Attorney General without approval from a more senior attorney. But the record reflects that Latham spent significant amounts of her time preparing and presenting cases on behalf of the Attorney General, in addition to, via briefs and other internal memoranda, advising the Attorney General (and other subordinate state attorneys acting for the Attorney General) on confidential and important legal matters regarding the prosecution of cases filed for the protection of Ohio consumers. Since the elected Attorney General is herself undoubtedly a policymaking employee, *see, e.g.*, *Shahar v. Bowers*, 114 F.3d 1097, 1103-04 (11th Cir. 1997), Latham's position as a confidential internal adviser and delegatee falls within the *Elrod* and *Branti* test.

Latham argues that this would mean that every government attorney is a policymaking attorney. But it is doubtless true that a wide array of government attorneys are policymaking employees. *See, e.g.*, *Aucoin v. Haney*, 306 F.3d 268 (5th Cir. 2002) (assistant district attorney); *Biggs v. Best, Best & Krieger*, 189 F.3d 989 (9th Cir. 1999) (private associate attorney working under partner contracted by deputy city attorney); *Vona v. County of Niagara*, 119 F.3d 201 (2d Cir. 1997) (assistant attorneys to county social services department); *Williams*, 909 F.2d at 155 (chief city attorney; also compiling many such cases); *Bauer v. Bosley*, 802 F.2d 1058 (8th Cir. 1986) (staff legal assistant in office of clerk of county court); *Ness v. Marshall*, 660 F.2d 517 (3d Cir. 1981) (city solicitor and assistant city solicitors).

The Seventh Circuit's opinion in *Americanos v. Carter*, 74 F.3d 138, 141 (7th Cir. 1996), is particularly instructive. In that case, the court found that an Indiana deputy attorney general ("DAG"; an analogous position in Indiana to Ohio's Assistant Attorney General position) was a policymaking employee and could be terminated merely for his political affiliations. The attorney attempted to argue that he personally had not exercised significant policymaking authority, but the court held that this did not matter:

> Although Americanos asserts that he was required to refer all issues and questions involving politics and/[or] policy making to Chief Counsel, and let that person make the ultimate decision on how to implement the AG's goals, it is likely that in making such referrals Americanos was asked to advise his superiors concerning what his research into these issues revealed, and what he thought would be the correct course of legal action. The plaintiff's mere participation in these types of discussions establishes that he had meaningful input into deciding how to handle legal issues for the state.

*Id*. at 142 (citations and quotations omitted). Noting that a DAG could be fired at any time by the Attorney General, that a DAG often appeared in proceedings representing the Attorney General, and that a DAG had statutory authority to be delegated *any* power of the attorney general, regardless of that DAG's specific assignment at any given time, the Seventh Circuit upheld his termination solely on political affiliation grounds. Other courts have likewise held that lower-level attorneys who still have significant responsibility are policymaking employees. *See, e.g.*, *Bauer v. Bosley*, 802 F.2d 1058 (8th Cir. 1986) (staff legal assistant in office of clerk of county court); *Livas v. Petka*, 711 F.2d 798 (7th Cir. 1983) (assistant state prosecutor); *Mummau v. Ranck*, 531 F. Supp. 402 (E.D.Pa. 1982), *aff'd per curiam*, 687 F.2d 9 (3d Cir. 1982) (assistant district attorney).

Latham's case is not significantly different from that of Americanos. Latham appeared in court on behalf of the Attorney General, drafted policy memoranda and prepared briefs for the Attorney General, and had to clear all of her work with a more senior state attorney, just as Americanos did. Latham's job description explains that she could exercise any duty of the Attorney General that the Attorney General opted to delegate to her, just as Americanos could. And even though Latham had to clear many of her actions with her superiors, she was as responsible as Americanos was in assisting in the formulation of state policies via recommendations made pursuant to individual cases or broader policy discussions.

We do not mean to say that every state employee who advises or serves under a policymaking individual is herself a policymaker. But where, as here, the employee exercises significant authority on behalf of a policymaker (even with close supervision), where the employee is responsible for making important policy implementation recommendations to a policymaker, and where the inherent duties of the employee are broad and limited primarily by the discretion of the policymaker, it is likely that the employee is herself a confidential or policymaking employee under *Elrod*.

Because Latham is a policymaking employee, our holding in *Rose,* that policymaking employees may be terminated for their speech and/or political affiliations without offending their First Amendment rights under *Elrod* and *Branti*, applies. Latham also argues that *Rose* was incorrectly decided. But only our Circuit *en banc* or the Supreme Court may overrule a decision of a panel of this Court. *See, e.g.*, *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004). Therefore, even had Latham been terminated solely on the basis of the 1995 letter expressing her view of then-current OAG policies, her First Amendment rights were not violated, and summary judgment on this claim was appropriate.

### C. Sovereign Immunity and the ADEA

Under the Eleventh Amendment, a State may not be sued in federal court unless it has consented to such a suit or its immunity has been properly abrogated by Congress. *See, e.g., Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). Here, the state has explicitly stated that it has not consented to Latham's suit. Noting this, the district court granted summary judgment for defendants on Latham's ADEA claim on the ground that the Supreme Court, in *Kimel v. Florida Board of Regents*, 528 U.S. 62, 91 (2000), held that Congress, when enacting the ADEA, did not abrogate States' sovereign immunity.

Latham contends that *Kimel* does not apply to her claim for retaliation under the ADEA, because, prior to *Kimel*, this Circuit had held that the ADEA *did* properly abrogate states' sovereign immunity claims. *See, e.g., Coger v. Bd. of Regents*, 154 F.3d 296 (6th Cir. 1998), *abrogated by Kimel*, 528 U.S. at 91. She argues, therefore, that a state actor should still be responsible for its retaliatory response to her attempts to protect rights that were, pre-*Kimel* in this Circuit, presumptively protected. However, Latham cites no caselaw for this proposition, and in fact finds herself in exactly the same position as were some of the plaintiffs in *Kimel*, who were themselves appealing dismissal of their retaliation claims under the prior regime. *See Kimel*, 528 U.S. at 69. *Kimel* held squarely that all such claims were precluded by the Eleventh Amendment, and Latham's case is no different.

Further, Latham argues that, because classifications based on *speech* are inherently suspect, "the anti-retaliation provisions of federal statutes [including the ADEA] do effectively abrogate state immunity" for claims grounded in the First Amendment. Final Br. of Appellant at 46. Thus, she claims, her speech-grounded ADEA arguments can be brought against the OAG. But this confuses two very different legal regimes. Latham is, of course, free to pursue claims against the OAG based on actual speech-based discrimination under the guarantees of the First, Fifth, and/or Fourteenth Amendments – indeed she has done so in her claim discussed *supra*. But claims under the ADEA must allege that a plaintiff was discriminated against on the basis of *age*, not speech, regardless of the conduct at issue. *See, e.g., Kimel,* 528 U.S. at 67 (citing text of statute). In *Kimel*, the Court clearly stated that "age is not a suspect classification under the Equal Protection Clause." *Id*. at 83. The Court also noted that the ADEA goes beyond the anti-discrimination mandate of the Constitution and would therefore require an abrogation of

sovereign immunity independent from that inherent in the Equal Protection Clause. *Id*. at 82–91. It is true that state immunity may properly be abrogated by Congress in certain constitutional areas, *see, e.g., Hutto v. Finney*, 437 U.S. 678 (1978); *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), but such abrogations must be clearly expressed by Congress. *See, e.g.*, *Quern v. Jordan*, 440 U.S. 332 (1979). The *Kimel* Court found no such abrogation in the ADEA. 528 U.S. at 82–91. As a result, Latham's attempt to mix an ADEA age-based claim with claims of speech-based discrimination in order to avoid the sovereign immunity bar of the Eleventh Amendment cannot succeed. Latham simply cannot sue a State under the ADEA without the State's consent.

## III.

For the preceding reasons, the district court's grant of summary judgment in favor of the OAG is **AFFIRMED**.